**HOTTENSTEIN et al. (MOORE, Intervenor) v. YORK ICE MACHINERY CORPORATION.**

No. 8097.

Circuit Court of Appeals, Third Circuit.

Argued Oct. 19. 1942.

Decided June 15, 1943.

Richard J. Mackey, of New York City, for appellant.

Aaron Finger and Robert H. Richards, both of Wilmington, Del. (George S. Munson, of Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, JONES, and GOODRICH, Circuit Judges.

BIGGS, Circuit Judge.

The intervening plaintiff, the appellant in the case at bar, is the owner of 50 shares of 7% cumulative preferred stock issued by the defendant York Ice Machinery Corporation, a Delaware corporation. The defendant was incorporated on March 22,

1927. On January 25, 1941 the outstanding capital stock of the defendant consisted of 56,371 shares of cumulative preferred stock [1] and 161,481 shares of common stock. On that date the unpaid accumulated dividends on each share of the preferred stock amounted to $88.25. The defendant also had bonds due October 1, 1947, in the principal amount of $5,808,500 and 10 year 6% sinking fund gold debentures in the principal amount of $612,000 which previously had borne a due date of December 1, 1937, but which had been extended to December 1, 1943.[2] The defendant also owed certain unsecured 3% notes to the amount of $118,500 due December 1, 1944. Its current liabilities, on the date specified, including sums due to trade creditors and taxes, payrolls, and interest on long term indebtedness calculated on an accrual basis, amounted to approximately $1,150,000.

Its assets as of September 30, 1940, were cash in excess of $1,000,000, notes and accounts receivable of more than $3,500,000 and inventories worth $3,800,000. It possessed miscellaneous assets including customers' notes, accounts receivable, stocks, bonds, mortgages and the capital stocks of affiliated companies worth more than $900,000. The defendant also owned a plant carried on its books at a value in excess of $7,000,000.

On January 25, 1941, the asset position of the defendant was good. It was solvent and its current assets greatly exceeded its current obligations, though refinancing of its funded debt obviously was required. Specifically it appears from a balance sheet of the defendant as of September 30, 1940, that an equity of about $4,300,000 was available for the preferred stock. The unpaid accumulated dividends on the preferred stock then amounted to approximately $4,600,000.[3] An examination of the income account of the defendant year by year for the five years ending September 30, 1940, shows its operations resulted in net income in 1940 of $483,121, in a loss in 1939 of $185,076, in a loss in 1938 of $119,753, in net income in 1937 of $957,649 and in net income in 1936 of $165,586. The financial

statement of the defendant also shows a net income of $1,202,000, for 1941. The earned surplus for this year was in excess of $800,000 contrasting with an earned surplus of $403,000 for the year 1940.

On January 25, 1941 the board of directors of the defendant sent a letter to each of its stockholders and presented for their consideration a "Plan for the Recapitalization of the Company". This letter stated in part that "During the depression years beginning in 1932 sales and earnings were sharply reduced and the [financial] situation [of the defendant] was further complicated by the heavy fixed sinking fund requirements on the funded debt which aggregate $463,000 per annum. The Company could not support this heavy drain on its resources, and in 1934 a readjustment plan was proposed and subsequently accepted by the holders of over 96% of its bonds and by all the holders of its debentures which are now outstanding. This plan provided, in the main, for the substitution of sinking funds on the two issues contingent on earnings, with the stipulation that no cash dividends could be paid on the Company's stocks until the accruals under the original fixed sinking funds had been met in full. The adoption of the Readjustment Plan by the Bond and Debenture Holders enable the Company to maintain its working capital, and the bonds, which at the time of the proposal were selling in the forties, are now at or near par."

The letter went on to say, "The aggregate unpaid Sinking Fund accruals under the original Sinking Funds at September 30, 1940, amounted to $1,850,500 and are currently accruing at the rate of $200,000 per annum. No dividends can be paid on either the Preferred or Common Stocks of the Company until these accruals have been entirely eliminated.

" * * * It is obvious from the * * * earning statement, covering the past five years, that large increase in earnings, maintained for a number of years, would be necessary to eliminate the Sinking Fund accruals of $1,850,500 and permit the payment of dividends. In the meantime, the large arrears in preferred dividends hamper

---

[1] Each share preferred stock is entitled to $100 and all unpaid accumulated dividends on the liquidation or dissolution of the defendant. Each share of preferred stock may be redeemed by the defendant at the rate of $107.50 plus unpaid accumulated dividends.

[2] Since paid off by money secured from a loan by certain bankers. See testimony of John F. Lebor, assistant treasurer of the defendant, Appendix p. 160 a.

[3] The last dividend upon the preferred stock was paid on January 2, 1931. Since the incorporation of the defendant the dividends paid on the preferred stock amounted to $4.50 a share. No dividend has ever been paid on the common stock.

re-financing of the Company's bonds on favorable terms, and even a partial refinancing by convertible bonds or debentures is not practical. Therefore, a merger is proposed with your Company's wholly owned and inactive subsidiary, York Corporation, which, if made effective, will result in your Company having only one class of stock outstanding and accomplish a desirable change of name."

The plan of recapitalization proposed by way of merger was that each share of the preferred stock of the defendant with accumulated dividends should be converted into fifteen shares of common stock of York Corporation as the "surviving" corporation, and that each share of the common stock of the defendant should be converted into one share of common stock of York Corporation. Upon consummation of the merger and the issuance of the new stock the holders of the preferred stock of the defendant will own 83.2% of all of the stock of York Corporation. The voting power of the present holders of the preferred stock of the defendant[4] will be increased from 24.8% to 83.2%. It should be noted that the plan of recapitalization does not purport to deal with the funded indebtedness of the defendant in any way. The directors' letter to the stockholders of the defendant also states that the common stockholders will benefit by the elimination of the prior claims of $10,047,090, representing the par value of the preferred stock plus the cumulative dividends accrued thereon as of January 25, 1941, and the preferred stockholders of the defendant will be benefited by their equity in the future earnings of York Corporation. The letter then states that it should be observed that the company's sales for the three months ending December 31, 1940, were $5,107,373, as compared to $3,588,630 in the same period of 1939; that the existing debt structure of the defendant with the sinking fund requirements and restrictions of the payment of dividends is a severe burden on the defendant and its stockholders; that refinancing of the funded debt is impeded by the arrearage of dividends on the preferred stock, and, if the plan of recapitalization is adopted, that " * * * it will be possible to consider re-financing more advantageously and

it may then be to the advantage of the Company to provide a part of the monies necessary, by the issuance of convertible bonds * * * [a result] * * * obviously impossible while the Preferred Stock is outstanding."

We have quoted from the directors' letter at such length because it shows that it was the intention of the defendant to reclassify its stock by way of merger with its wholly owned subsidiary, York Corporation.

York Corporation is also a Delaware corporation. It was incorporated at the direction of the defendant on or about January 5, 1939. Its charter provides that its capital stock shall consist of 250 shares of stock without par value. The defendant purchased twenty shares of the stock of York Corporation for $1,000, the stock having a stated value of $50 a share. On October 11, 1940, the president and secretary of York Corporation issued to the defendant a certificate for 20 shares of stock. No other certificate has been issued. York Corporation has never carried on business. So far as appears from the record, it stood awaiting merger with the defendant.

The minute book of the defendant shows the following facts. Some time prior to November 19, 1937, a committee was appointed by the board of directors " * * * to consider a change of corporate name". On December 28, 1937, this committee reported that a change of name for the corporation should not be undertaken at that time in view of a plan to create a new issue of preferred stock. On November 29, 1938, nearly a year later, the president of the defendant reported that he had appointed a committee to discuss with banking houses the possibility of refinancing the company's indebtedness. At this meeting a resolution was adopted to the effect that steps should be taken to bring about some "adjustment" between the preferred stockholders and the common stockholders in order to permit a refinancing of the company's indebtedness. At the same meeting the standing committee to consider a change of the corporate name of the defendant was instructed to make further investigations in respect to that subject and was directed to report at the earliest practical date to the board. On

---

[4] The holders of the preferred stock are entitled to vote share for share with the holders of the common stock. The right of the preferred stockholders so to vote is not dependent on the omission of any dividend on the preferred stock but was granted in the amendment to the charter of the defendant authorizing it to issue preferred stock.

December 23, 1938, at a special meeting of the board the committee on refinancing was instructed to formulate and submit to the board "as soon as practical a plan or plans by merger or otherwise to eliminate the preferred stock and the unpaid dividends thereon". At the same time the chairman of the committee on change of name stated to the board that the name "York Corporation" was available in Delaware.[5] The defendant's counsel thereupon was instructed to cause a new company to be incorporated in Delaware "with a purely nominal capital, for the purpose of preempting the name York Corporation" in that state. On January 23, 1939, the committee on refinancing recommended recapitalization of the defendant by conversion of the preferred stock with accumulated dividends into common stock on the basis of ten shares of common for each share of preferred stock. At the same time the committee presented to the board a form of letter to be mailed by the defendant to stockholders in order to acquaint them with the situation of the defendant and "to ascertain their approval or disapproval of the plan". On April 3, 1939, the chairman[6] of the committee on refinancing stated that the company had not received from its stockholders a sufficient number of acceptances to effect the plan of recapitalization or to justify proceeding with the plan. The committee stated that it was unlikely that the company acting through its own representatives could secure the assent of a sufficient number of stockholders to consummate any plan of refinancing. The committee thereupon was authorized to engage the services of investment bankers to explain the merits of any plan of refinancing that might be approved by the board.

On May 3, 1939, the committee on refinancing recommended to the board that the proposed plan be amended and that the preferred stockholders be offered twelve shares of common stock for each share of preferred stock with accumulated dividends, "the recapitalization to be made thru a merger with the 'York Corporation'". The officers of the defendant were directed to prepare an agreement for the merger of the defendant with York Corporation, the surviving corporation to have one class of stock, the preferred stockholders to receive twelve shares of stock of York Corporation for each share of preferred with accumulated dividends, the common stockholders of the defendant to receive one share of York Corporation for each share of common. On June 12, 1939, at another meeting of the board the chairman of the committee on refinancing reported that "another court decision had been handed down in Delaware which made it impractical for the company to further consider the possibility of eliminating the present issue of preferred stock by a merger".[7] The chairman then recommended that the plan then under consideration be changed so as to give to the preferred stockholders seven shares of common stock of York Corporation for each share of preferred then held by them and in addition a certificate "evidencing their rights to the accrued dividends thereon". The board deferred action pending further consideration of the entire subject by the committee on refinancing.

On June 14, 1940, that committee reported " * * * that the committee had been advised that although an exchange of preferred stock for common stock could be accomplished by a paper merger, a merger with an independent company in active business would be desirable * * * that the committee were of the opinion that on any exchange the holders of preferred stock should receive from 80% to 85% of the book value of the capital stock * * * [and] that efforts were being made to interest the Alco Company in a merger". On September 13, 1940 the chairman of the committee on refinancing recommended specifically that a merger be effected between the defendant and York Corporation and that the holders of preferred stock be asked to surrender it and its accumulated dividends in exchange for fifteen shares of the common stock of York Corporation.[8] The board approved the report and recommendation of the committee. The officers

---

[5] The name had been previously preempted by another corporation but subsequently was released.

[6] It is interesting to observe that the chairman of this committee, Elmer A. Kleinschmidt, owned only preferred stock.

[7] Undoubtedly the reference is to the decision of Chancellor Harrington in Havender v. Federal United Corporation, Del.Ch.1939, 6 A.2d 618, decided June 2, 1939.

[8] The decision of the Supreme Court of Delaware in Federal United Corporation v. Havender, infra, reversing the decision of the Chancellor, was handed down on January 16, 1940. Reargument was denied on February 1, 1940. See Del.Sup.1940, 11 A.2d 331.

948

of the defendant were authorized to take all steps necessary to effect the merger. On October 11, 1940, the chairman of the committee on refinancing informed the board that the defendant had subscribed to stock of York Corporation of a stated value of $1,000 but that this action had never been formally reported to the board. The board thereupon ratified the subscription.

At a meeting of the board on January 14, 1941, the plan of recapitalization by way of merger was formally approved by the board. The letter of January 25, 1941, was then mailed to all stockholders of the defendant.

On March 25, 1941, a special meeting of the stockholders of the defendant was held for the purpose of passing upon the proposed merger of the defendant with York Corporation. This meeting was adjourned until May 28, 1941. Prior to the adjourned meeting, the secretary reported to the board of directors that proxies in favor of the proposed merger had been received from the holders of 39,094 shares of preferred stock and from the holders of 119,880 shares of common stock and that written objections to the merger had been filed by the holders of 6,287 shares of preferred stock and by the holders of 542 shares of common stock. On the day of the adjourned meeting the merger was consummated, 40,527 shares of preferred and 121,-326 shares of common stock being voted in favor of the resolution and merger, 1,499 shares of preferred stock and 240 shares of common stock being voted against the resolution and merger out of the total of 56,571 shares of preferred stock and 161,481 shares of common stock issued and outstanding.

Additional facts must be stated. Over 50% of the common stock of the defendant was owned by two directors and members of their family groups. The directors and their groups owned less than 25% of the preferred stock. The original complaint was filed in the court below on March 12, 1941. The appellant filed his intervening complaint on May 27, 1941. The latter complaint alleges that the appellant has brought his suit not only on his own behalf but also on behalf of all persons situated like unto himself. He prayed for a preliminary injunction to restrain the defendant from holding the adjourned stockholders meeting to vote upon the proposed merger, and, in the event the court declared that the accrued accumulated dividends on the preferred stock could not be affected by the merger, that the defendant be enjoined " * * * from paying dividends upon any of the capital stock without first providing for and liquidating the arrears of dividends which up to January 25, 1941, [had] accrued on the preferred stock of the intervening plaintiff * * * ". An answer was filed and hearings were held.

No preliminary injunction was granted. The learned District Judge dismissed the cause upon the merits. See, D.C., 45 F. Supp. 436. The appeal at bar followed.

We think it clear from the facts of the case at bar that the defendant has evoked the provisions of Section 59 of the General Corporation Law of Delaware, Section 2091, Revised Code 1935, in order to avoid the effect of the decisions of the Supreme Court of Delaware in Keller v. Wilson & Co., Inc., 21 Del.Ch. 391, 190 A. 115, which reversed the decision of Chancellor Wolcott, 21 Del.Ch. 13, 180 A. 584, and in Consolidated Film Industries v. Johnson, 22 Del.Ch. 407, 197 A. 489, which affirmed the decision of that Chancellor, 22 Del.Ch. 262, 194 A. 844. The cases cited arose under Section 26 of the General Corporation Law of Delaware, Section 2058, Revised Code 1935. The decisions of the Supreme Court of Delaware in the Keller and Consolidated Film Industries cases are so well known to the bench and bar of this circuit that there is no need to dwell on them at great length in this opinion. It is enough to say that following the decision of the Supreme Court in the cited cases the directors of a Delaware corporation and its stockholders knew that whether a class of cumulative preferred stock was created before or after the 1927 amendments to Section 26 of the General Corporation Law (35 Del.Laws, c. 85, Sec. 10), accrued accumulated dividends could not be adjusted by the provisions of Section 26. In short, it was clear that a preferred stockholder's right to accumulated unpaid dividends could not be divested by a reclassification under Section 26 of the General Corporation Law even when a majority of the stockholders of the class consented thereto over the objection of dissident stockholders. The Supreme Court of Delaware stated in the Keller case that the right of the preferred stockholder to the unpaid dividends which had accrued through the passage of time on his cumulative preferred stock was to be " * * * regarded as a vested right of property secured against

destruction by the Federal and State Constitutions." [21 Del.Ch. 391, 190 A. 125.] [9] See 21 Del.Ch. 391, 412, 190 A. 115, 125. This statement was made upon excellent authority. The doctrine appears in the law of Delaware in an early opinion of Chancellor Wolcott in Morris v. American Public Utilities Co., 14 Del.Ch. 136, 149, 122 A. 696, 703. It was reiterated by the Supreme Court of Delaware recently in Shanik v. White Sewing Machine Corporation, Del. Sup. 1941, 19 A.2d 831. But in the Keller case, the Supreme Court of Delaware went a step further. It stated, 21 Del.Ch. 413, 190 A. 125, dealing with the 1927 amendment to Section 26, 35 Del. Laws, c. 85, Sec. 10, "Section 26 of the General Corporation Law is the section authorizing amendments of corporate charters. It authorizes nothing more than it purports to authorize, the amendment of charters. The cancellation of cumulative dividends already accrued through passage of time is not an amendment of a charter. It is the destruction of a right in the nature of a debt, a matter not within the purview of the section. The cancellation of the right to such dividends is foreign to the design and purpose of the section. The effect of the charter amendment, in so far as it concerns the status of the shares and the rights of the owners, speaking from the time of its accomplishment, is not denied by the complainants; but there is nothing in the language of the section, as amended, which compels a retrospective operation. The rights of cumulative preferred shareholders to the stipulated dividends accrue to them by virtue of the contract. That right exists and persists. When the necessary corporate action, under the amended statute conferring the power is taken, the status of the shares may be changed, and the right thereafter to claim the dividends as originally stipulated may be cancelled, but the amended statute under the general rule of construction, ought not to have a retroactive effect."

It follows, as Chancellor Wolcott pointed out, in his opinion in Johnson v. Consolidated Film Industries, supra, that it would make no difference if the corporation, whose preferred stock was to be divested of unpaid accumulated dividends, was incorporated before or after the 1927 amendment to Section 26 or if the issuance of the preferred stock was authorized before or aft-

---

[9] In the Keller case the treatment of the right of the preferred stockholder to accumulated unpaid dividends as a vested right of property was not made contingent upon the existence of any earnings or surplus from which they could be paid. Chief Justice Layton stated, 21 Del.Ch. 411, 190 A. 124: "To say that cumulative dividends can not be paid where there are no profits at hand from which to pay them is not to say that they do not accrue under the contract; and unless the corporate surplus and the financial condition of the corporation are such that it would be an abuse of discretion on the part of the management not to declare and pay a dividend on cumulative preferred stock, there seems to be no more reason to view the right of the shareholder as vested than in the case where no surplus exists at all, for in either situation the shareholder has no immediate assertable right, nor may he ever have such right."

The Supreme Court of Delaware, relying on its earlier decision in Penington v. Commonwealth Hotel Construction Corporation, 17 Del.Ch. 394, 400, 155 A. 514, 517, 75 A.L.R. 1136, in which it quoted with approval the words of Chancellor Wolcott in Morris v. American Public Utilities Co., 14 Del.Ch. 136, 149, 122 A. 696, 703, treated dividends which had accumulated on preferred stock through the passage of time as a vested right of property. It is difficult for us to perceive why the right to an unaccrued dividend is any less "vested" than a right to a dividend which has accrued. In the case at bar the applicable charter provision (Certificate of Amendment of York Ice Machinery Corporation, filed October 3, 1927), which is a very normal one, provides, "Fourth. b. The holders of the preferred stock shall be entitled to receive dividends at the rate of 7% a year, and no more, from October 1, 1927, payable quarterly on the first days of January, April, July and October in each year, in preference and priority to the payment of any dividend on the common stock; such dividends on the preferred stock shall be cumulative, so that if in any year dividends at the full rate of 7% a share shall not have been paid on the preferred stock the deficiency shall be payable before any dividend in any future year shall be paid upon the common stock." In short, the payment of dividends to common stockholders is simply as usual made contingent upon the payment of accumulated dividends and provision for the payment of current annual dividends on the preferred stock. This is the extent of the preferred stockholder's "vested" right of property to dividends.

er that amendment. The cancellation of accumulated dividends, accrued through the passage of time, had been held by the Supreme Court in the Keller case not to be an amendment to a Delaware charter. We think it is fair to state that the bar generally concluded that the right of a preferred stockholder to unpaid accumulated dividends could not be affected or adjusted without his consent. This conclusion was short-lived.

In Havender v. Federal United Corporation, Del.Ch. 1938, 2 A.2d 143, 146, 147, the late Chancellor Wolcott held that Section 59 of the General Corporation Law of Delaware, Sec. 2091, Revised Code, 1935, setting forth provisions for the consolidation or merger of Delaware corporations could not be employed to enable a Delaware corporation to extinguish the right of preferred stockholders to receive in cash dividends accumulated on their preferred stock by merging the corporation in which they were stockholders with a wholly owned inactive subsidiary, thereby effecting a reclassification of their stock. Following Chancellor Wolcott's death, the Havender case was reargued before the present Chancellor, who expressed substantially the same conclusions as those of his predecessor. See Del.Ch. 1939, 6 A.2d 618. On appeal to the Supreme Court of Delaware that tribunal reversed the Chancellors. Del.Sup. 1940, 11 A.2d 331. If it is fair to say that the decision of the Supreme Court of Delaware in the Keller case astonished the corporate world,[10] it is just to state that the decision of the Supreme Court in Havender astounded it, for shorn of rationalization the decision constitutes a repudiation of principles enunciated in the Keller case and in Consolidated Film Industries v. Johnson, supra.

If, as the Supreme Court of Delaware stated in the Keller case, the cancellation of dividends is not an amendment to a charter and the right of the holders of cumulative preferred stock to unpaid dividends accrued through the passage of time is a vested right of property secured against destruction by the Federal and State Constitutions, that right is protected by the Fourteenth Amendment to the Constitution of the United States and by Section 7 of Article 1 of the Constitution of the State of Delaware. If the right is a vested right of property, protected by constitutional guarantees the holder can be as little deprived of it by merger or consolidation under Section 59 as by reclassification under Section 26. If the terms of the contract between the preferred stockholder and his corporation cannot be changed by any charter amendment, the preferred stockholder is entitled to the protection of the Contract Clause, Section 10, Article 1 of the Federal Constitution. If the intervening complainant in the case at bar is being deprived of a vested right in property in violation of the provisions of the Fourteenth Amendment to the Constitution of the United States, the court below should have granted the injunctive relief sought by the appellant.

But, such is not the situation. The right of the preferred stockholder in the instant case is to receive payment of his unpaid dividends in preference and priority to the payment of any dividend on the common stock. See footnote 9, supra. Such a right should not be given the status of a vested property right in view of the power of self-amendment conferred on the defendant by the 1927 amendment to Section 26 which was in force when the defendant in the case at bar was incorporated and when the charter amendment authorizing the issue of preferred stock was lodged with the Secretary of State of Delaware. In view of the power of self-amendment conferred upon the defendant we think it is clear that the intervening complainant may not claim the protection of the Contract Clause. We think for the reasons stated hereinafter that he is not entitled to make the claim that he is being deprived of his right without due process of law within the purview of the Fourteenth Amendment. We are called upon simply to interpret the law of Delaware. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487.

After reflection we find ourselves unable to reconcile the decision of the Supreme Court of Delaware in the Havender case with its pronouncements in the Keller case that cancellation of cumulative dividends accrued through the passage of time is not an amendment of a charter and that

---

[10] The decision was directly off the line which the courts of Delaware theretofore had followed in reclassification cases. See the decision of Chancellor Wolcott in Keller v. Wilson & Co., supra. Cf.

Morris v. American Public Utilities Co., 14 Del.Ch. 136, 122 A. 696. See (1937) 46 Yale L.J. 985 discussing the problems of recapitalization engendered by Keller v. Wilson & Co., Inc., supra.

the right of a holder of cumulative preferred stock to unpaid dividends is a vested right of property secured against destruction by the Federal and State Constitutions. While the approach of the Supreme Court in the Havender case was through Section 59, which, as was stated, had remained substantially unchanged in form since the adoption of the General Corporation Law in 1899, 21 Del. Laws c. 273,[11] and the approach in the Keller case was through Section 26, we must conclude that Havender broke Keller's back.

In Havender a parent corporation merged with its wholly owned inactive subsidiary. Both of the constituent corporations were Delaware corporations. The outstanding stock of the subsidiary consisted of 1,010 no par shares which were to be cancelled and the parent was to receive nothing therefor. The case can be distinguished from the case at bar in only one particular. The wholly owned subsidiary was not created for the purpose of merging with the parent. The Supreme Court held, as we have already indicated, that the unpaid accumulated dividends which amounted to $29 per share of preferred stock could be cancelled by a merger conducted in the form prescribed by the provisions of Section 59. Quite apart from the foregoing, the court also held that the complainant dissenting shareholders were guilty of laches. We are not concerned with this point in the

case at bar for the original complaint in this case was filed March 12, 1937, prior to any meeting of stockholders to vote upon the merger.

The Supreme Court of Delaware applied the words and phrases of Section 59 literally. The power to merge was held not to be qualified or restricted by limitation or exception. The court stated, Del.Sup. 1940, 11 A.2d 337, "The language of the authority is plain, understandable and general. * * * The general rule of statutory construction repeatedly affirmed by the courts of this state generally, and, in particular, by this court, is that where the language of a statute is plain and conveys a clear and definite meaning, the courts will give to the statute the exact meaning conveyed by the language, adding nothing thereto, and taking nothing therefrom. * * * And, specifically, where the Legislature had made no exception to the positive terms of a statute, the presumption is that it intended to make none, and it is not the province of the court to do so. * * *

"It is for the Legislature not for the court, to declare the public policy of the state; and it is not, therefore, the function of the court to graft an exception on the plain and positive terms of the statute."[12]

■ It follows, therefore, that it is the law of Delaware that a parent corporation

[11] The Supreme Court stated, 11 A.2d 338, "The substantial elements of the merger and consolidation provisions of the General Corporation Law as they now appear have existed from the time of the inception of the law. It is elementary that these provisions are written into every corporate charter. The shareholder has notice that the corporation whose shares he has acquired may be merged with another corporation if the required majority of the shareholders agree. He is informed that the merger agreement may prescribe the terms and conditions of the merger, the mode of carrying it into effect, and the manner of converting the shares of the constituent corporations into the shares of the resulting corporation. A well understood meaning of the word 'convert', is to alter in form, substance or quality. Substantial rights of shareholders, as is well known, may include rights in respect of voting, options, preferences and dividends. The average intelligent mind must be held to know that dividends may accumulate on preferred stock, and that in the event of a merger of the corporation issuing the

stock with another corporation, the various rights of shareholders, including the right to dividends on preference stock accrued but unpaid, may, and perhaps must, be the subject of reconcilement and adjustment; for, in many cases, it would be impracticable to effect a merger if the rights attached to the shares could not be dealt with."

This approach would be logical where two active going business corporations merged. It is scarcely applicable under the circumstances of the Havender case where the merger was between a going parent and an inactive subsidiary.

[12] It should be noted that the amendment of April 13, 1937 to Section 59 (Section 2, c. 131, 41 Del.Laws) creating Section 59A, providing for the merger of a parent corporation and a wholly owned subsidiary, was held by the court to be merely "* * * declaratory of the right of all Delaware corporations to consolidate or merge, its immediate purpose being, not a grant of power, but a simplification of procedure with respect to mergers of parent corporations with their wholly-owned subsidiaries."

may merge with a wholly owned inactive subsidiary, cancelling old preferred stock and the rights of the holders thereof to unpaid accumulated dividends, substituting in lieu thereof stocks of the surviving corporation.[13]

It should be noted that the question of fairness of the reclassification was not considered by the Supreme Court in the Havender case and the case was disposed of (the holding as to laches aside) on the ground of corporate power. It should be observed also that Chancellor Wolcott upheld Wilson & Company's proposed reclassification in the Keller case without considering the fairness of the plan and that the Supreme Court held the reorganization invalid on a ground which rendered fairness irrelevant. In the recent case of Porges v. Vadsco Sales Corporation, Del. Ch. 1943, 32 A.2d 148, 150, the Vice-Chancellor of Delaware devotes a substantial portion of his opinion to a discussion of the question of fairness. In the Porges case a merger was proposed pursuant to the provisions of Sections 59 and 59A of the General Corporation Law between a parent and its wholly owned subsidiary. The Vice-Chancellor lays emphasis upon the provisions of Section 61 of the General Corporation Law, Section 2093, Revised Code, 1935, as amended, which provides that a stockholder objecting to a merger or consolidation may withdraw from the enterprise and obtain payment in money for the value of his stock.[14] He quotes from the decision of Chancellor Wolcott in Cole v. National Cash Credit Association, 18 Del. Ch. 47, 56, 156 A. 183, 187, as follows: "'As a general proposition dissenting stockholders are thus put to an election by the statute.'" In respect to the issue of fairness the Vice-Chancellor states, "However, there are exceptional circumstances under which a stockholder is not obliged to make an election to accept the merger or to demand the value of his stock in money, but may enlist the aid of a court of equity to restrain the consummation of the merger. In the Cole case, the Chancellor gave examples of such circumstances, and said,

'The exercise of the statutory right of merger is always subject to nullification for fraud.'"

An examination of the examples cited in the Cole case leads us to the conclusion that actual fraud will cause the Delaware courts to restrain a merger. Actual fraud amounts to misrepresentation, concealment or deception. The allocation of equities in the surviving corporation between the old preferred and common stockholders may be so unfair as to amount to constructive fraud in the eyes of the Delaware Courts. Vice-Chancellor Pearson states, "When fraud of this nature is charged, the unfairness must be of such character and must be so clearly demonstrated as to impel the conclusion that it emanates from acts of bad faith, or a reckless indifference to the rights of others interested, rather than from an honest error of judgment", citing the Cole case and MacFarlane v. N. A. Cement Corporation, 16 Del.Ch. 172, 157 A. 396.[15]

In the case at bar can it be asserted justly that the reclassification which is actually worked by the merger is so unfair to the intervening complainant and those like situated that it amounts to constructive fraud? The balance sheet of the defendant corporation shows that as of September 30, 1940, the equity above the par value of the cumulative preferred stock amounted to $4,384,000, whereas as of that day the arrearage of dividends on the preferred stock amounted to $4,616,000. This arrearage was accumulating at the rate of 7% per annum. Upon the other hand, the earnings of the defendant have increased substantially and by the merger the preferred stockholders gain control of the company. It should be noted also that when the plan of reclassification by merger became public the preferred stock nearly doubled in price on the market. The increased earnings should create an equity for the common stockholders of the defendant. Substantial funded indebtedness must be refinanced in the not distant future. As a practical matter we know that it is difficult to refinance corporate indebtedness when there are heavy arrearages of accumulated dividends

---

[13] It should be noted that in the Havender case as in the case at bar a surplus was available for the payment of dividends on the preferred stock. In the Havender case there was no earned surplus as there is in the case at bar. An earned surplus is not necessary in order to pay dividends under the law of Delaware.

[14] A right which was available to the intervening complainant in the case at bar.

[15] See the discussion of such fraud, actual or constructive in the opinion of Chancellor Wolcott in the Cole case, 18 Del.Ch. 55, 156 A. 187, 188, under the heading, "Bill of Cole, et al.".

outstanding. A corporation so situated reasonably may expect litigation and its concomitant miseries. Bankers are loath to float security issues under such circumstances. We are of the opinion that it is not unjust under all the circumstances of the case at bar to treat the equity of the common stockholders as being worth approximately 17% of the stock of the surviving corporation. It follows that the reclassification is fair.

We come, therefore, to the final question in the case at bar, which, however inconsistently, we must treat as one of corporate power. Though there is substantial evidence that the defendant corporation did desire to change its cumbersome title to a new and more realistic name, the evidence is overwhelming that York Corporation was created by the defendant for the primary and principal purpose of effecting a reclassification, cancelling the accumulated preferred dividends on the preferred stock, by merger with it. York Corporation was brought into being by the defendant with the purpose, intention and design of effecting that which a director of the defendant and the chairman of its committee on refinancing characterized as a " 'paper' merger". As we have said, this is the point of difference between the facts of the instant case and those in Havender. Corporation Bond & Share Company, though it was a totally owned and inactive subsidiary of Federal United Corporation, was not brought into existence by Federal United for the purpose of a merger. No case has been before the courts of Delaware which involved this precise question. In the Havender case, however, Chancellor Wolcott delivered a dictum which is most pertinent.

Chancellor Wolcott said, 2 A.2d 147, "I am of the opinion that the merger was not conceived in any genuine purpose which mergers are designed to serve. Its object and aim was to reclassify the defendant's shares in a manner which the Supreme Court of this State has declared to be not permissible. If what the defendant did will stand the test of legal legitimacy, I can see no escape from the proposition that all a corporation needs to do to escape the results of the law as laid down by our Supreme Court, is to create a subsidiary for itself and then proceed to absorb it by merger. If it be said that deliberation to evade would be too conspicuous in that case to warrant overlooking it, the answer is that evasion cannot be any the more objectionable simply because it might be a little more conspicuous. The difference between using a wholly owned subsidiary already existing and using one specially created for the purpose, to accomplish by a merger an end which bears no perceptible relation to the problem involved in and incidental to the merging operation, is a difference which rests on no basis of substance."

The late great Chancellor wrote with prescience. What he said stands as the only direct evidence as to the law of Delaware today upon the question before us. The conclusion is inescapable that he was correct in his statement. Further evidence as to the law of Delaware, though it is of an indirect nature, is supplied by the opinion of the Supreme Court in the appeal in the Havender case. The literal application of the phrases of Section 59 of the General Corporation Law by the Supreme Court will permit and enable a Delaware corporation to effect a reclassification which will cancel the accumulated dividends on preferred stock by merger with an inactive wholly owned subsidiary specially created for that purpose. Between inactive Corporation Bond & Share Company, not created for the purpose of merger, and inactive York Corporation, created for the purpose of merger, there is little to choose. The Keller case remains a landmark in the law of Delaware only to signify that what cannot be done directly under Section 26 of the General Corporation Law may be done by subterfuge under Section 59. A court of the United States bound by the rule of Erie R. Co. v. Tompkins is powerless to afford aid to the stockholder until reclassification reaches that degree of unfairness where it amounts to a cancellation of the preferred stockholders' accumulated unpaid dividends without adequate compensation therefor under the law, either by way of a share in the equity of the surviving corporation or by the payment of money under Section 61 of the General Corporation Law. At such a point a court of the United States might grant injunctive relief under the provisions of the Fourteenth Amendment.[16] Such is not the situation in the

---

[16] At such a point the courts of Delaware might well hold that a merger was void because of constructive fraud. It is interesting to note that the last session of the General Assembly of Delaware amended the fourth paragraph of Section 59 and Section 61. The laws enacted by this session of the General Assembly have

case at bar, for as we have stated the plan is fair.

Accordingly the judgment of the court below is affirmed.

not yet been promulgated by the Secretary of State pursuant to the provisions of Section 2, Chapter X of the Revised Code of Delaware, 1935. It appears, however, that by the amendment to Section 59, inter alia the Secretary of State is made the agent of the corporation to accept service on its behalf in any suit brought to enforce the right of any stockholder "* * * as determined in appraisal proceedings pursuant to the provisions of Section 61 * * *".

The amendments to Section 61 provide, inter alia, that the Chancellor shall appoint an appraiser to determine the value of the shares of the dissatisfied stockholder and the surviving corporation may petition the Court of Chancery within a period of thirty days to demand the appraisal of the stock of all dissatisfied stockholders who have filed written objection to the merger as provided by the section.