249 A.2d 89.

MICHAEL J. BOVE III *et al. vs.* THE COMMUNITY HOTEL
CORPORATION OF NEWPORT, RHODE ISLAND *et al.*

JANUARY 16, 1969.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

JOSLIN, J.   This civil action was brought in the superior court to enjoin a proposed merger of The Community Hotel Corporation of Newport, Rhode Island, a defendant herein, into Newport Hotel Corp.   Both corporations were organized under the general corporation law of this state and are hereinafter referred to respectively as "Community Hotel" and "Newport."   No oral testimony was presented and a trial justice sitting without a jury decided the case on the facts appearing in the exhibits and as assented to by the parties in the pretrial order.   The case is here on the plaintiffs' appeal from a judgment denying injunctive relief and dismissing the action.

Community Hotel was incorporated on October 21, 1924, for the stated purpose of erecting, maintaining, operating, managing and leasing hotels; and it commenced operations in 1927 with the opening of the Viking Hotel in Newport. Its authorized capital stock consists of 6,000 shares of $100 par value six per cent prior preference cumulative preferred stock, and 6,000 shares of no par common stock of which 2,106 shares are issued and outstanding.   The plaintiffs as well as the individual defendants are holders and owners of preferred stock, plaintiffs having acquired their holdings of approximately 900 shares not later than 1930.   At the time this suit was commenced, dividends on the 4,335 then-

38

issued and outstanding preferred shares had accrued, but had not been declared, for approximately 24 years, and totalled about $645,000 or $148.75 per share.

Newport was organized at the instance and request of the board of directors of Community Hotel solely for the purpose of effectuating the merger which is the subject matter of this action. Its authorized capital stock consists of 80,000 shares of common stock, par value $1.00, of which only one share has been issued, and that to Community Hotel for a consideration of $10.

The essentials of the merger plan call for Community Hotel to merge into Newport, which will then become the surviving corporation. Although previously without assets, Newport will, if the contemplated merger is effectuated, acquire the sole ownership of all the property and assets now owned by Community Hotel. The plan also calls for the outstanding shares of Community Hotel's capital stock to be converted into shares of the capital stock of Newport upon the following basis: Each outstanding share of the constituent corporation's preferred stock, together with all accrued dividends thereon, will be changed and converted into five shares of the $1.00 par value common stock of the surviving corporation; and each share of the constituent corporation's no par common stock will be changed and converted into one share of the common stock, $1.00 par value, of the surviving corporation.

Consistent with the requirements of G. L. 1956, §7-5-3,[1]

---

[1]Section 7-5-3 in pertinent part provides:

"Said agreement shall be submitted to the stockholders of each constituent corporation at a meeting thereof called separately for the purpose of taking the same into consideration. * * * At said meeting said agreement shall be considered and the stockholders of said corporation shall vote by ballot, in person or by proxy, for the adoption or rejection of the said agreement, each share entitling the holder thereof to one (1) vote, and if the votes of the stockholders of each such corporation representing at least two-thirds of the shares of each class of its capital stock shall be for

the merger will become effective only if the plan receives the affirmative votes of the stockholders of each of the corporations representing at least two-thirds of the shares of each class of its capital stock. For the purpose of obtaining the required approval, notice was given to both common and preferred stockholders of Community Hotel that a special meeting would be held for the purpose of considering and voting upon the proposed merger. Before the scheduled meeting date arrived, this action was commenced and the meeting was postponed to a future time and place. So far as the record before us indicates, it has not yet been held.

The plaintiffs argue that the primary, and indeed, the only purpose of the proposed merger is to eliminate the priorities of the preferred stock with less than the unanimous consent of its holders. Assuming that premise, a preliminary matter for our consideration concerns the merger of a parent corporation into a wholly-owned subsidiary created for the sole purpose of achieving a recapitalization which will eliminate the parent's preferred stock and the dividends accumulated thereon, and whether such a merger qualifies within the contemplation of the statute permitting any two or more corporations to merge into a single corporation.

It is true, of course, that to accomplish the proposed recapitalization by amending Community Hotel's articles of association under relevant provisions of the general corporation law[2] would require the unanimous vote of the pre-

---

the adoption of said agreement * * * the agreement so adopted and certified * * * shall thence be taken and deemed to be the agreement and act of consolidation or merger of said corporations * * *."

[2]Section 7-2-18, as amended, provides that a corporation may "* * * from time to time when and as desired amend its articles of association * * *" and §7-2-19. as amended, provides that "Unless otherwise provided in the articles of association, every such amendment shall require the affirmative vote of the following proportion of the stockholders, passed at a meeting duly called for the purpose:

**40**

ferred shareholders, whereas under the merger statute, only a two-third vote of those stockholders will be needed. Concededly, unanimity of the preferred stockholders is unobtainable in this case, and plaintiffs argue, therefore, that to permit the less restrictive provisions of the merger statute to be used to accomplish indirectly what otherwise would be incapable of being accomplished directly by the more stringent amendment procedures of the general corporation law is tantamount to sanctioning a circumvention or perversion of that law.

The question, however, is not whether recapitalization by the merger route is a subterfuge, but whether a merger which is designed for the sole purpose of cancelling the rights of preferred stockholders with the consent of less than all has been authorized by the legislature. The controlling statute is §7-5-2. Its language is clear, all-embracing and unqualified. It authorizes any two or more business corporations *which were or might have been organized* under the general corporation law to merge into a single corporation; and it provides that the merger agreement shall prescribe "* * * the terms and conditions of consolidation or merger, the mode of carrying the same into effect * * * *as well as the manner of converting the shares of each of the constituent corporations into shares or other securities of the corporation resulting from or surviving such consolidation or merger,* with such other details and provisions as are deemed necessary."[3] (underlining ours)

---

"(a) * * *

"(b) Where the amendment diminishes the stipulated rate of dividends on any class of stock or the stipulated amount to be paid thereon in case of call or liquidation, the unanimous vote of the stockholders of such class and the vote of a majority in interest of all other stockholders entitled to vote."

[3] The quoted provision is substantially identical to the Delaware merger statute (Del. Rev. Code (1935) C. 65, §2091) construed in *Federal United Corp.* v. *Havender,* 24 Del. Ch. 318, 11 A.2d 331, *infra* pp. 9-12.

Nothing in that language even suggests that the legislature intended to make *underlying purpose* a standard for determining permissibility. Indeed, the contrary is apparent since the very breadth of the language selected presupposes a complete lack of concern with whether the merger is designed to further the mutual interests of two existing and non-affiliated corporations or whether alternatively it is purposed solely upon effecting a substantial change in an existing corporation's capital structure.

Moreover, that a possible effect of corporate action under the merger statute is not possible, or is even forbidden, under another section of the general corporation law is of no import, it being settled that the several sections of that law may have independent legal significance, and that the validity of corporate action taken pursuant to one section is not necessarily dependent upon its being valid under another. *Hariton* v. *Arco Electronics, Inc.*, 40 Del. Ch. 326, 182 A.2d 22, *aff'd*, 41 Del. Ch. 74, 188 A.2d 123; *Langfelder* v. *Universal Laboratories Inc.*, 68 F. Supp. 209, *aff'd*, 163 F.2d 804.

We hold, therefore, that nothing within the purview of our statute forbids a merger between a parent and a subsidiary corporation even under circumstances where the merger device has been resorted to solely for the purpose of obviating the necessity for the unanimous vote which would otherwise be required in order to cancel the priorities of preferred shareholders. *Federal United Corp.* v. *Havender, supra; Hottenstein* v. *York Ice Machinery Corp.*, 136 F.2d 944; 7 Fletcher, *Cyclopedia of Corporations*, chap. 43, §3696.1, page 892.

A more basic problem, narrowed so as to bring it within the factual context of this case, is whether the right of a holder of cumulative preferred stock to dividend arrearages and other preferences may be cancelled by a statutory merger. That precise problem has not heretofore been before

42

this court, but elsewhere there is a considerable body of law on the subject. There is no need to discuss all of the authorities. For illustrative purposes it is sufficient that we refer principally to cases involving Delaware corporations. That state is important as a state of incorporation, and the decisions of its courts on the precise problem are not only referred to and relied on by the parties, but are generally considered to be the leading ones in the field.

The earliest case in point of time is *Keller* v. *Wilson & Co.*, 21 Del. Ch. 391, 190 A. 115 (1936). Wilson & Company was formed and its stock was issued in 1925 and the law then in effect protected against charter amendments which might destroy a preferred shareholder's right to accumulated dividends. In 1927 that law was amended so as to permit such destruction, and thereafter the stockholders of Wilson & Company, by the required majorities, voted to cancel the dividends which had by then accrued on its preferred stock. In invalidating that action the rationale of the Delaware court was that the right of a holder of a corporation's cumulative preferred stock to eventual payment of dividend arrearages was a fixed contractual right, that it was a property right in the nature of a debt, that it was vested, and that it could not be destroyed by corporate action taken under legislative authority subsequently conferred, without the consent of all of the shareholders.

*Consolidated Film Industries, Inc.* v. *Johnson*, 22 Del. Ch. 407, 197 A. 489 (1937), decided a year later, was an almost precisely similar case. The only difference was that Consolidated Film Industries, Inc. was not created until after the adoption of the 1927 amendment, whereas in the earlier case the statutory amendment upon which Wilson & Company purported to act postdated both its creation and the issuance of its stock. Notwithstanding the *Keller* rationale that an investor should be entitled to rely upon the law in existence at the time the preferred stock was

issued, the court in this case was "* * * unable to discover a difference in principle between the two cases." In refusing to allow the proposed reclassification, it reasoned that a shareholder's fixed contractual right to unpaid dividends is of such dignity that it cannot be diminished or eliminated retrospectively even if the authorizing legislation precedes the issuance of its stock.

Two years elapsed before *Federal United Corp.* v. *Havender, supra,* was decided. The issue was substantially the same as that in the two cases which preceded. The dissenting stockholders had argued, as might have been expected, that the proposed corporate action, even though styled a "merger," was in effect a *Keller* type recapitalization and was entitled to no different treatment. Notwithstanding that argument, the court did not refer to the preferred stockholder's right as "vested" or as "a property right in the nature of a debt." Neither did it reject the use of *Keller*-type nomenclature as creating "confusion" or as "substitutes for reason and analysis" which are the characterizations used respectively in *Davison* v. *Parke, Austin & Lipscomb, Inc.,* 285 N. Y. 500, 509, 35 N.E.2d 618, 622; Meck, *Accrued Dividends on Cumulative Preferred Stocks; The Legal Doctrine,* 55 Harv. L. Rev. 7, 76. Instead, it talked about the extent of the corporate power under the merger statute; and it held that the statute in existence when Federal United Corp. was organized had in effect been written into its charter, and that its preferred shareholders had thereby been advised and informed that their rights to accrued dividends might be extinguished by corporate action taken pursuant thereto.

Faced with a question of corporate action adjusting preferred stock dividends, and required to apply Delaware law under *Erie R.R.* v. *Tompkins,* 304 U. S. 64, 58 Sup. Ct. 817, 82 L. Ed. 1188, it is understandable that a federal court in *Hottenstein* v. *York Ice Machinery Corp.,* 136 F.2d 944,

950, found *Keller, Johnson* and *Havender* irreconcilable and said,

> "If it is fair to say that the decision of the Supreme Court of Delaware in the Keller case astonished the corporate world, it is just to state that the decision of the Supreme Court in Havender astounded it, for shorn of rationalization the decision constitutes a repudiation of principles enunciated in the Keller case and in Consolidated Film Industries v. Johnson, supra." at 950.[4]

With Keller's back thus broken, *Hottenstein* went on to say that under Delaware law a parent corporation may merge with a wholly-owned inactive subsidiary pursuant to a plan cancelling preferred stock and the rights of holders thereof to unpaid accumulated dividends and substituting in lieu thereof stock of the surviving corporation.

Only four years intervened between *Keller* and *Havender,* but that was long enough for Delaware to have discarded "vested rights" as the test for determining the power of a corporation to eliminate a shareholder's right to preferred stock dividend accumulation, and to have adopted in its stead a standard calling for judicial inquiry into whether the proposed interference with a preferred stockholder's contract has been authorized by the legislature. The *Havender* approach is the one to which we subscribe as being the sounder, and it has support in the authorities.

---

[4]To the same effect the court in *Western Foundry Co.* v. *Wicker,* 403 Ill. 260, said at 277, 85 N.E.2d 722 at 730:

"Thus, what was formerly regarded as an almost inviolable vested property right was now considered a mere defeasible right, subject to cancellation by merger by reason of the consent of the preferred shareholders granted at the time the stock was originally issued. There being little or no difference between a recapitalization by corporate amendment and recapitalization by merger of a parent corporation with a wholly-owned subsidiary, the present status of the *Keller case* is obscure. While not expressly overruled, the theory of the *Keller case* was entirely repudiated. Consequently, as an authority for the proposition that the power to change the 'rights' of preferred stock does not include the right to cancel unpaid cumulative dividends, *Keller* v. *Wilson & Co.* is highly questionable."

*Davison* v. *Parke, Austin & Lipscomb, Inc., supra; Langfelder* v. *Union Laboratories, Inc.*, 163 F.2d 804; *Western Foundry Co.* v. *Wicker, supra,* note 4; *Anderson* v. *International Minerals & Chemical Corp.*, 295 N. Y. 343, 67 N.E.2d 573; *Hubbard* v. *Jones Laughlin Steel Corp.*, 42 F. Supp. 432; *Donohue* v. *Heuser*, 239 S.W.2d 238 (Ky).

The plaintiffs do not suggest, other than as they may have argued that this particular merger is a subterfuge, that our merger statute will not permit in any circumstances a merger for the sole reason that it affects accrued, but undeclared, preferred stock dividends. Rather do they argue that what should control is the date of the enactment of the enabling legislation, and they point out that in *Havender,* Federal United Corp. was organized and its stock was issued subsequent to the adoption of the statute authorizing mergers, whereas in this case the corporate creation and the stock issue preceded adoption of such a statute. That distinguishing feature brings into question what limitations, if any, exist to a state's authority under the reserved power to permit by subsequent legislation corporate acts which affect the preferential rights of a stockholder. More specifically, it raises the problem of whether subsequent legislation is repugnant to the federal and state constitutional prohibitions against the passage of laws impairing the obligations of contracts, because it permits elimination of accumulated preferred dividends by a lesser vote than was required under the law in existence at the time of the incorporation and when the stock was issued.

The mere mention of the constitutional prohibitions against such laws calls to mind *Trustees of Dartmouth College* v. *Woodward,* 4 Wheaton 518, where the decision was that a private corporation charter granted by the state is a contract protected under the constitution against repeal, amendment or alteration by subsequent legislation. Of equal significance in the field of corporation law is Mr. Jus-

tice Story's concurring opinion wherein he suggested that application of the impairment clause upon acts of incorporation might be avoided if a state legislature, coincident with granting a corporate charter, reserved as a part of that contract the right of amendment or repeal. With such a reservation, he said, any subsequent amendment or repeal would be pursuant, rather than repugnant, to the terms of the contract and would not therefore impair its obligation.

Our own legislature[5] was quick to heed Story's advice, and in the early part of the 19th century, when corporations were customarily created by special act, the power to alter, amend, or revoke was written directly into each charter. Later, when the practice changed and corporations, instead of being created by special enactment, were incorporated under the general corporation law, the power to amend and repeal was reserved in an act of general application, and since at least as far back as 1844[6] the corporation law has read in substance as it does today viz., "* * * The charter or articles of association of every corporation hereafter created may be amended or repealed at the will of the general assembly." Section 7-1-13.

The language in which the reserved power is customarily stated is not, however, self-explaining, and the extent of the legislative authority under it has frequently been a source of difficulty. Recognizing that problem, but not answering it, the United States Supreme Court said in a frequently quoted passage:

> "The authority of a state under the so-called reserve power is wide; but it is not unlimited. The corporate charter may be repealed or amended, and, within limits not now necessary to define, the interrelations of state,

[5] *State* v. *Brown & Sharpe Mfg. Co.*, 18 R. I. 16, 25 A. 246, contains a detailed discussion of the *Dartmouth College* case, the concurring opinion of Mr. Justice Story and the impact of each upon subsequent legislative enactments affecting corporations.

[6] Revision of Public Laws 1844, page 64.

corporation and stockholders may be changed; but neither vested property rights nor the obligation of contracts of third persons may be destroyed or impaired." *Coombes* v. *Getz,* 285 U. S. 434, 441-442, 52 Sup. Ct. 435, 436, 76 L. Ed. 866, 871.

The problem is not novel in this court. In *State* v. *Brown & Sharpe Mfg. Co., supra,* note 5, we said that the reservation of the power to alter or amend does not confer upon the state arbitrary control over the rights and property belonging to a body of corporators. Additionally, relying on *Shields* v. *Ohio,* 95 U. S. 319, 24 L. Ed. 357, we adopted as a "just and proper" rule that amendments or alterations proposed under the power, if they are to satisfy the constitutional requirement, must be reasonable, must be in good faith, and must not be inconsistent with the scope and object of the act of incorporation.

The plaintiffs go further than *Brown & Sharpe Mfg. Co., supra.* They judge the legislation, not by the "just and proper" rule, but by the date when it came into existence; and they insist that any legislation, if enacted subsequent to the creation of a corporation and the issuance of its preferred stock, may not be a source of authority for corporate action which deprives a holder of his stock or of its preferential rights or of the dividends accrued thereon. An attempt to do so, they say, constitutes an unconstitutional exercise of the reserved power. On this issue, as on most others in this case, the authorities are not in accord.

On the one side, there is a body of law which speaks of the three-fold nature of the stockholder's contract and, while agreeable to an exercise of the reserved power affecting only the contractual relationship between the state and the corporation, rejects as unconstitutional any exercise which affects the relationship between the stockholder and the corporation or between the stockholders inter sese. *Wheatley* v. *A. I. Root Co.,* 147 Ohio St. 127, 69 N.E.2d 187; *Schaad* v. *Hotel Easton Co.,* 369 Pa. 486, 87 A.2d 227. Under this

view, subsequent legislation purporting to permit a corporate act to cancel accrued preferred dividends would obviously be an improper exercise of the power inasmuch as the essence of a preferred stockholder's contract is its definition of his relationship with the corporation and with the other stockholders vis-à-vis such matters as the distribution of the profits of the enterprise or the division of its capital and surplus account in the event of liquidation.

The other side of the argument considers that the question is primarily one of statutory construction and that so long as the statute authorizes the corporate action, it should make no difference whether its enactment preceded or post-dated the birth of the corporation or the issuance of its stock.[7]  The basis for this viewpoint is that the terms of the preferred stockholder's contractual relationship are not restricted to the specifics inscribed on the stock certificate, but include also the stipulations contained in the charter or articles of association as well as the pertinent provisions of the general corporation law.  One of those provisions is, of course, the reserved power; and so long as it is a part of the preferred shareholder's contract, any subsequent legislation enacted pursuant to it, even though it may amend the contract's original terms, will not impair its obligation in the constitutional sense.  It is as if the stock certificate were inscribed with the legend "All of the terms and conditions hereof may be changed by the legislature acting pursuant to the power it has reserved in G. L. 1956, §7-1-13."

Speaking to this question, it has been said that "It is no more constitutional to permit the Legislature, under

---

[7]This, in substance was the basis for the decision in *Consolidated Film Industries, Inc.* v. *Johnson, supra,* pp. 8-9. The corporation there, as distinguished from the one in *Keller* v. *Wilson & Co., supra,* page 8, was created subsequent to the amendment which permitted recapitalization. Nonetheless, the court was "* * * unable to discover a difference in principle between the two cases."

the reserved power, to authorize a corporation to abolish dividends which have accrued in the past, than it is to authorize a corporation to abolish dividends which may accrue in the future. There is a difference in degree, but not one of kind. In both cases there is interference with a contractual relationship between the stockholders and the corporation or between the stockholders inter sese. But this the Legislature is permitted to do, certainly under the reserved power in the Constitution and in the General Corporation Law, to alter or amend the charters of corporations * * *." *McNulty* v. *W. & J. Sloane,* 184 Misc. 835, 845, 54 N.Y.S.2d 253, 263. See also *Bingham* v. *Savings Investment and Trust Co.,* 101 N.J.Eq. 413, 138 A. 659, *aff'd* 102 N.J.Eq. 302, 140 A. 321.

It remains to be ascertained how the diverse views jibe with our own precedents. While we have no direct authority, two early cases discuss in some detail the extent to which a shareholder's rights may be affected by corporate action taken under authority of legislation enacted pursuant to the reserved power. The first is *Bailey* v. *Trustees of Power Street Methodist Episcopal Church,* 6 R. I. 491. There a pewholder held title under deeds which expressly subjected his pews to such rates and taxes as his grantor, an unincorporated church society, might impose for its general expenses and repairs. When the church society subsequently incorporated, its charter specified that the assent of the majority of the pewholders was prerequisite to the imposition of a pew tax. Thereafter a charter amendment enacted pursuant to the reserved power restored to the society "* * * the untrammelled power to tax the pews according to the tenor of the deeds of the pewholders * * *." The validity of a tax assessed pursuant to that amendment was upheld, the court saying that the immunity from taxation conferred by the original charter, rather than being permanent, existed only during the pleasure of the general

assembly; and that the assembly in amending the charter "\* \* \* certainly impaired the obligation of no contract contained either in the deeds or the charter, and derogated from no right or interest of the pewholders of a fixed or permanent character."

*Bailey,* while to a considerable degree apposite, does not directly assist on whether in matters of this kind the controlling law should be that in effect when the corporation is organized and the stock issued. This is so because in *Bailey* the pews, when acquired, were taxable by the society without necessity of shareholder acquiescence and all that was accomplished by the charter amendment permitting assessment was to restore that status as it had originally existed. The same accommodation, however, will not serve to explain *Gardner* v. *Hope Ins. Co.,* 9 R. I. 194. There, when the defendant insurance company was chartered and when the plaintiff's stock was issued, the law in existence did not permit fully paid stock to be assessed. By subsequent amendment enacted pursuant to the reserved power, Hope Insurance Co. was empowered to assess stock previously issued notwithstanding that it may have been fully paid, in order "\* \* \* to fill up the capital stock to its original amount." An assessment made pursuant to that authorization was upheld, the court saying at 199-200:

> "The legislature have reserved the power, at any time to alter or repeal the charter, or any of its provisions. The corporators accepted it upon this condition, and agreed that its provisions might be changed, and every purchaser of stock in this company has assented to these terms, and has agreed to hold his shares subject to this liability to change. There is no limit to the power expressed in the act. In terms it is unlimited."

While we do not, particularly in the light of what has been written since, necessarily subscribe to the reasoning of *Gardner* in its entirety, it is a precedent. And if in that case subsequent legislation enacted pursuant to the reserved

power may with propriety be a source of authority for an insurance company to revoke a stockholder's freedom from assessment on his fully paid stock, then certainly in the instant case such legislation may also with equal propriety be the basis for a corporation to employ the merger device as a means of cancelling preferred stock and the dividends accumulated thereon. In each instance, to be sure, the stockholder's contractual rights have been altered, but in each instance the alterations are permitted by the stockholder's contract into which the law reads the reserved power to amend or repeal. That power is a part of the charter or articles of association of every Rhode Island corporation. *Gardner* v. *Hope Insurance Co., supra.*

One other case, although perhaps distinguishable because it involves a public utility, merits mention. It is the case of *Narragansett Electric Lighting Co.* v. *Sabre,* 50 R. I. 288, 146 A. 777, where the special legislative act incorporating the Narragansett Electric Company authorized the Narragansett Electric Lighting Company upon the approval of at least two-thirds of its shareholders to transfer and convey all of its assets to the newly incorporated company. Notwithstanding that the vendor company as originally chartered lacked power to transfer all of its assets, the sale was sustained as against the complaint of a dissenting shareholder that the obligation of his contract had been impaired by the subsequent legislation. See also *East Providence Water Co.* v. *Public Utilities Comm'n,* 46 R. I. 458, 128 A. 556.

On the basis of our own precedents we conclude that the merger legislation, notwithtstanding its effect on the rights of its stockholders, did not necessarily constitute an improper exercise of the right of amendment reserved merely because it was subsequent.

In addition to arguing that the proposed plan suffers from a constitutional infirmity, plaintiffs also contend that

it is unfair and inequitable to them, and that its consummation should, therefore, be enjoined. By that assertion they raise the problem of whether equity should heed the request of a dissenting stockholder and intervene to prevent a merger notwithstanding that it has received the vote[3] of the designated proportions of the various classes of stock of the constituent corporations.

In looking to the authorities for assistance on this question, we avoided those involving recapitalization by charter amendment where a dissident's only remedy against allegedly unfair treatment was in equity. In those situations the authorities generally permit equitable intervention to protect against unfair or inequitable treatment. *Kamena* v. *Janssen Dairy Corp.*, 133 N.J.Eq. 214, 31 A.2d 200, *aff'd*, 134 N.J.Eq. 359, 35 A.2d 894. They are founded on the concept that otherwise there might be confiscation without recompense. The same rationale, however, is not available in the case of a merger, because there the dissenting stockholders usually can find a measure of protection in the statutory procedures giving them the option to compel the corporation to purchase their shares at an appraised value. This is a significant difference and is ample reason for considering the two situations as raising separate and distinct issues. *Anderson* v. *International Minerals & Chemical Corp., supra.*

This case involves a merger, not a recapitalization by charter amendment, and in this state the legislature, looking to the possibility that there might be those who would not be agreeable to the proposed merger, provided a means whereby a dissatisfied stockholder might demand and the corporation be compelled to pay the fair value of his securi-

---

[3] For purposes of this proceeding we have accepted the implied assumption of all of the parties that the proposed merger will receive the required vote and we have not sua sponte suggested that the suit might more properly have awaited that eventuality.

ties. G. L. 1956, §§7-5-8 through 7-5-16 inclusive. Our inquiry then is to the effect of that remedy upon plaintiff's right to challenge the proposed merger on the ground that it is unfair and inequitable because it dictates what shall be their proportionate interests in the corporate assets. Once again there is no agreement among the authorities. Vorenberg, "Exclusiveness of the Dissenting Stockholder's Appraisal Right," 77 Harv. L. Rev. 1189. See also Annot. 162 A.L.R. 1237, 1250. Some authorities appear to say that the statutory remedy of appraisal is exclusive. *Beloff v. Consolidated Edison Co.*, 300 N. Y. 11, 87 N.E.2d 561; *Hubbard v. Jones & Laughlin Steel Corp.*, 42 F. Supp. 432. Others say that it may be disregarded and that equity may intervene if the minority is treated oppressively or unfairly, *Barnett v. Philadelphia Market Co.*, 218 Pa. 649, 67 A. 912; *May v. Midwest Refining Co.*, 121 F.2d 431, *cert. denied* 314 U. S. 668, 62 Sup. Ct. 129, 86 L. Ed. 534, or if the merger is tainted with fraud or illegality, *Adams v. United States Distributing Corp.*, 184 Va. 134, 147, 34 S.E.2d 244, 250; *Porges v. Vadsco Sales Corp.*, 27 Del. Ch. 127, 32 A.2d 148. To these differing views must also be added the divergence of opinion on whether those in control or those dissenting must bear the burden of establishing that the plan meets whatever the required standard may be. Vorenberg, *supra;* 77 Harv. L. Rev. 1189, 1210-1215.

In this case we do not choose as between the varying views, nor is there any need for us to do so. Even were we to accept that view which is most favorable to plaintiffs we still would not be able to find that they have been either unfairly or inequitably treated. The record insofar as it relates to the unfairness issue is at best sparse. In substance it consists of the corporation's balance sheet as of September 1967, together with supporting schedules. That statement uses book, rather than the appraised, values, and neither it nor any other evidentiary matter in any way

indicates, except as the same may be reflected in the surplus account, the corporation's earning history or its prospects for profitable operations in the future.

Going to the figures we find a capital and surplus account of $669,948 of which $453,000 is allocable to the 4,530 issued and outstanding shares of $100 par value preferred stock and the balance of $216,948 to surplus. Obviously, a realization of the book value of the assets in the event of liquidation, forced or otherwise, would not only leave nothing for the common stockholders, but would not even suffice to pay the preferred shareholders the par value of their stock plus the accrued dividends of $645,000.

If we were to follow a rule of absolute priority, any proposal which would give anything to common stockholders without first providing for full payment of stated value plus dividend accruals would be unfair to the preferred shareholders. It could be argued that the proposal in this case violates that rule because an exchange of one share of Community Hotel's preferred stock for five shares of Newport's common stock would give the preferred shareholders securities worth less than the amount of their liquidation preference rights while at the same time the one to one exchange ratio on the common would enrich Community Hotel's common stockholders by allowing them to participate in its surplus.

An inherent fallacy in applying the rule of absolute priority to the circumstances of this case, however, is its assumption that assets would be liquidated and that nothing more than their book value will be realized. But Community Hotel is not in liquidation. Instead it is a going concern which, because of its present capitalization, cannot obtain the modern debt-financing needed to meet threatened competition. Moreover, management, in the call of the meeting at which it was intended to consider and vote on the plan, said that the proposed recapitalization plan

was conceived only "* * * after careful consideration by your Board of Directors and a review of the relative values of the preferred and common stocks by the independent public accountants of the Corporation. The exchange ratio of five new common shares for each share of the existing preferred stock was determined on the basis of the book and market values of the preferred and the inherent value of the unpaid preferred dividends." Those assertions are contained in a document admitted as an exhibit and they have testimonial value.

When the varying considerations — both balance sheet figures and management's assertions — are taken into account, we are unable to conclude, at least at this stage of the proceedings, that the proposed plan is unfair and inequitable, particularly because plaintiffs as dissidents may avail themselves of the opportunity to receive the fair market value of their securities under the appraisal methods prescribed in §7-5-8 through §7-5-16 inclusive.

The plaintiffs argue that due consideration will not be given to their dividend accruals under the appraisal. We do not agree. *Jeffrey* v. *American Screw Co.*, 98 R. I. 286, 201 A.2d 146, requires that the securities of a dissident invoking the statute must be appraised by a person "versed in the intricacies of corporate finance." Such a person will find when he looks to *Jeffrey* for guidance that the evaluation process requires him to consider "* * * all relevant value factors including market value, book value, asset value, and other intrinsic factors probative of value." Certainly, unpaid dividend arrearages fall within that directive and are a relevant factor to be considered in arriving at the full and fair cash value of the plaintiffs' preferred stock. While we make no decision one way or the other on the exclusiveness of appraisal as a remedy for a dissident, we do decide that its availability is an element or a

circumstance which equity should weigh before intervening. When that is done in this case, we find no ground for intervention.

For the reasons stated, the judgment appealed from is affirmed.

*Carroll, Kelly & Murphy, Ambrose W. Carroll*, for plaintiffs.

*Edwards & Angell, Knight Edwards, Benjamin P. Harris, III*, for defendants.