Daniel K. DOWLING and Stephen Casner, on behalf of themselves and all other similarly situated former stockholders of Narragansett Capital Corporation

v.

NARRAGANSETT CAPITAL CORPORATION, Arthur D. Little, Gregory P. Barber, Roger A. Vanderberg, Jonathan M. Nelson, Geraldine M. McNulty, Robert D. Manchester, Robert S. Davis, Raymond J. Armstrong, William P. Consodine, Harvey J. Sarles, John R. Rockwell, Frederick G. Frost, III, Rosalie J. Wolf, John M. Fox, Norman E. McCulloch, Jr., Paul A. Gusti, Lillian C. Martin, Doris M. Vigliotti, and Salomon Brothers, Inc.

Civ. A. No. 87–0213–T.

United States District Court,
D. Rhode Island.

April 17, 1990.

Dennis E. Murray, Kirk J. Delli Bovi, Sandusky, Ohio, Robert D. Fine, Melvin L. Zurier, Licht & Semonoff, Providence, R.I., for plaintiffs.

Robert Flanders, Jeffrey C. Schreck, Robert Karmen, Flanders & Medeiros, Providence, R.I., for defendants.

Allen P. Rubine, Providence, R.I., for Salomon Brothers.

Thomas J. Schwarz, Skadden, Arps, Slate, Meagher & Flom, New York City, for Robert Manchester.

## MEMORANDUM AND ORDER

TORRES, District Judge.

This is a suit by some former shareholders of Narragansett Capital Corporation who seek damages for the sale of all of the corporation's assets for what they say was a grossly inadequate price. Most of the defendants are directors, officers and/or shareholders who are accused of having orchestrated the sale for their own benefit and having solicited the approval of the remaining shareholders without adequately informing them about the nature of the transaction. It is before the Court on the defendants' motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b) for failure to state a claim upon which relief may be granted and for failure to aver fraud with sufficient particularity. Those motions require the Court to address the disclosure requirements of the Securities and Exchange Act of 1934 (1934 SEA) and the self-dealing prohibitions of the Investment Company Act of 1940 (ICA) as well as the scope of an investment banker's liability

for "fairness opinions" rendered in connection with such sales.

## I. The Complaint

The complaint alleges that, in 1986, the plaintiffs were shareholders of Narragansett Capital Corporation (NCC), a Rhode Island corporation. NCC was a publicly traded closed-end investment company that invested in securities and provided venture capital to finance leveraged buyouts. The individual defendants were NCC's directors, officers, and controlling shareholders. Several of them (to wit: Little, Manchester, Barber, Vanderberg, Nelson, and McNulty who are hereinafter referred to as the "NMC owners") also own Narragansett Management Company (NMC), a Delaware corporation engaged in the business of providing investment advice.

The complaint further alleges that on June 30, 1986 the individual defendants caused NCC and its wholly-owned subsidiary, Narragansett Venture Capital (NVC), to enter into an asset purchase agreement with Monarch Capital Corporation (Monarch). Under the terms of that agreement, NCC and NVC were to sell all of their assets to Monarch. A special meeting of NCC's shareholders was scheduled for September of 1986 to approve the sale and adopt a plan to liquidate and dissolve NCC and NVC. Pursuant to that plan, NCC's shareholders were to receive approximately $56 in cash and tax credits for each share owned. Notice of the meeting was accompanied by a proxy statement in which NCC's board of directors recommended approval of the proposed transactions describing it as "fair" and in the "best interest of the stockholders." The board's recommendation was buttressed by an opinion expressed by Salomon Brothers, Inc. (Salomon), an investment banking firm hired by NCC, that the proposed purchase price fairly reflected the value of NCC's stock.

According to the complaint, the purchase price was not a fair one and the shareholders were unable to recognize its inadequacy because the proxy statement omitted and misrepresented a number of facts material to an accurate determination of value. The complaint further alleges that the defendants' motives and actions were tainted by an agreement between Monarch and NMC. Pursuant to that agreement, Monarch was to employ NMC as its investment adviser, and NMC was to receive an annual fee of 2–3% of the value of assets under management plus 20% of any profit realized by Monarch upon the sale of the assets acquired from Narragansett. In any event, the plaintiffs opposed the transaction, but it was approved by a majority of the shareholders. Accordingly, the sale and liquidation were consummated, and this action ensued.

The complaint contains eight counts. The first seven seek damages from NCC and various individual defendants. Count Eight is directed solely at Salomon. Count One demands compensatory and punitive damages from NCC and all of the individual defendants for what is characterized as bad faith and fraud. It is based on allegations that the defendants knowingly misled the shareholders regarding the true value of their stock by using inaccurate valuation methods, by recommending an inadequate sale price, and by failing to disclose material information regarding the value of NCC's interest in two limited partnerships and the agreement between Monarch and NMC. In addition, it charges that the defendants made no effort to secure the best price obtainable for NCC's assets.

Count Two also seeks compensatory and punitive damages from NCC and the individual defendants. It alleges violations of Section 14(a) of the 1934 SEA and its implementing regulations. 15 U.S.C. § 78n(a) and 17 C.F.R. § 240.14a–9. More specifically, it charges that the proxy statement misrepresented and omitted material facts regarding the value of NCC's stock and the nature of the NMC owners' interest in the transaction.

Count Three demands compensatory damages from the NMC owners for breaches of their common law fiduciary duties. It focuses on two assertions. The first is that they negotiated the agreement between NMC and Monarch from which they personally profited at the same time that NCC

and Monarch were negotiating the asset purchase agreement. The second is that, through NMC, they misappropriated corporate opportunities by utilizing investment knowledge and information gleaned through their association with NCC.

In Count Four, the plaintiffs ask for compensatory and punitive damages from the NMC owners for violating § 10(b) of the 1934 SEA and Rule 10b–5 [1] by knowingly disclosing confidential inside information to Monarch in order to facilitate the asset purchase from which they expected to profit, and by failing to make required disclosures to NCC's shareholders.

Count Five seeks compensatory damages from the individual defendants for allegedly violating §§ 17(a)(2) and 48(a) of the ICA [2] which prohibit a person "affiliated" with a registered investment company from, directly or indirectly, purchasing any property from it. The gist of this claim is that the defendants, in effect, made such a purchase by diverting a portion of the profits from the asset sale to themselves through the guise of arranging for NMC to manage those assets.

In Count Six, the plaintiffs demand compensatory and punitive damages from NCC and the individual defendants for alleged breaches of fiduciary duties imposed by § 36(a) of the ICA.[3] Specifically, the plaintiffs claim the defendants failed to communicate to the disinterested directors all relevant information about the sale and that, in exchange for a share of the profits and incentive compensation to which they were not otherwise entitled, they conspired with Monarch to enable it to obtain NCC's assets at a grossly inadequate price.

Count Seven seeks compensatory and punitive damages from NCC and the individual defendants for their alleged failure to comply with the disclosure requirements of § 13(e) of the 1934 SEA and related SEC rules.[4] In particular, it asserts that the defendants failed to adequately reveal and analyze the factors on which they relied in recommending the sale.

Count Eight is directed solely at Salomon. It claims damages for what is alleged to be Salomon's negligent misrepresentation of the adequacy of the sale price in its fairness opinion.

## II. The Rule 9(b) Motion

One of the motions to dismiss is based on the contention that the complaint fails to set forth the circumstances constituting the alleged fraud with the particularity required by Fed.R.Civ.P. 9(b). That rule states:

> (b) *Fraud, Mistake, Condition of the Mind.* In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

■ Since fraud embraces a wide variety of conduct, one purpose of the rule is to provide the defendant with information that is sufficiently particularized to enable him to understand the precise nature of the allegations and to prepare a response. 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1296 (1969). Another purpose, that is especially applicable in the context of securities litigation, is to deter groundless claims that are asserted solely for tactical reasons or for purposes of extracting nuisance settlements. *Wayne Investment v. Gulf Oil Corp.,* 739 F.2d 11, 13 (1st Cir.1984); *Philippe v. Shape,* 688 F.Supp. 783, 786 (D.Me.1988).

■ Generally speaking, the rule requires "specification of the time, place, and content of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred." *Hayduk v. Lanna,* 775 F.2d 441, 444 (1st Cir.1985); *McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226, 228 (1st Cir. 1980). Allegations based on "information

---

**1.** 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5.

**2.** 15 U.S.C. §§ 80a–17(a)(2) and 80a–47(a).

**3.** 15 U.S.C. §§ 80a–35(a).

**4.** 15 U.S.C. § 78m(e)(1); 17 C.F.R. §§ 240.13e–3 and 240.13e–13.

and belief" do not satisfy the particularity requirement unless the complaint sets forth the facts on which the belief is grounded. *Wayne*, 739 F.2d at 13. Moreover, the requirement of particularity applies "even when the fraud relates to matters peculiarly within the knowledge of the opposing party" although the plaintiff may be entitled to discovery in such circumstances if the remaining allegations suggest a sufficient likelihood of fraud. *Hayduk*, 775 F.2d at 444; *Wayne*, 739 F.2d at 14. *Cf. New England Data Services v. Becher*, 829 F.2d 286 (1st Cir.1987).

In this case, the complaint clearly sets forth the time, place and content of the alleged fraudulent representations with sufficient particularity to satisfy the requirements of Rule 9(b). It specifically refers to the defendants' statements regarding the fairness of the proposed transaction and to their failure to disclose material information regarding such matters as the value of NCC's interest in named ventures and the existence of the agreement between NMC and Monarch. In addition, it is replete with allegations of specific conduct and activities which, if proven, would easily support findings that the defendants acted with the type of knowledge and intent necessary to make out a claim for fraud. *See Hayduk*, 775 F.2d at 444 (false *representation* must be detailed, not evidence of fraudulent *intent*); *Simcox v. San Juan Shipyard, Inc.*, 754 F.2d 430, 439 (1st Cir.1985) ("short and plain statement of the claim" is sufficient to meet the intent requirements of Rule 9(b)); 5 C. Wright and A. Miller, *Federal Practice and Procedure* § 1301 (1969). In short, the allegations of fraud pass muster under Rule 9(b).

### III. The Rule 12(b)(6) Motion

In moving to dismiss pursuant to Rule 12(b)(6), the defendants have, in essence, compiled an exhaustive list of nearly every element that the plaintiffs must prove in connection with each claim and have asserted that the complaint fails to allege facts sufficient to establish any of them. Their litany of reasons for dismissal includes as-

sertions that the complaint fails to adequately allege that: (1) the proxy statement misstated or omitted any material fact; (2) the plaintiffs were purchasers or sellers of any securities; (3) the plaintiffs relied on the proxy statement; (4) Monarch was an affiliate of NCC, NMC or the individual defendants within the meaning of § 17(a)(2) of the ICA; (5) the defendants controlled NCC within the meaning of § 48(a) of the ICA; (6) the defendants engaged in any of the activities prohibited by § 48(a); or that (7) the defendants breached any fiduciary duty. In addition, they assert that: (8) § 13(e)(1) of the 1934 SEA does not apply to this type of transaction; (9) there is no private right of action under § 13(e)(1) of the 1934 SEA or §§ 17(a)(2) or 36(a) of the ICA; (10) the liability imposed on controlling persons by §§ 20(a) and (b) of the 1934 SEA does not apply because it is contingent upon other violations of that statute; (11) the defendants cannot be liable under § 36(a) of the ICA because they were not officers or directors of NCC at the time suit was brought; (12) an action of this nature may only be maintained as a derivative suit; and (13) the plaintiffs' sole remedy is appraisal of their stock pursuant to state law.

As will be seen, some of the arguments comprising this compendium present difficult issues for resolution. Others are clearly without merit. The Court will begin the formidable task of sorting through this sometimes overlapping melange of contentions by grouping them into categories corresponding to the bodies of law to which they relate. In so doing, the Court must bear in mind the well established standard that in ruling on a Rule 12(b)(6) motion to dismiss, the Court's function is not to make factual determinations. Rather, it must consider only the allegations that appear in the complaint and should construe them in the light most favorable to the plaintiffs. Having done so, the complaint should be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d

80 (1957). *See Harper v. Cserr,* 544 F.2d 1121, 1122 (1st Cir.1976).

## A. *Standing*

At the outset, the defendants advance two reasons why they say the plaintiffs, in essence, have no standing or right to maintain this action. First, they contend that the claims asserted must be brought as a derivative suit on behalf of NCC rather than as a suit by individual shareholders. Second, with regard to those claims based on alleged violations of the securities laws, they assert that the statutes in question may only be enforced by the SEC and do not give rise to private causes of action. Those arguments will be considered in turn.

### 1. *The Derivative Suit Requirement*

■ The general rule is that an action to redress an injury to a corporation must be brought as a derivative suit and may not be maintained by shareholders acting in their individual capacities. *Vincel v. White Motor Corp.,* 521 F.2d 1113, 1118 (2d Cir. 1975). However, if the injury in question is one sustained by the shareholders, directly, they may sue on their own behalf. *Empire Life Ins. Co. of America v. Valdak Corp.,* 468 F.2d 330, 335 (5th Cir.1972). In determining whether a particular claim is derivative or personal, the Court must consider the nature of the harm inflicted and the nature of the rights violated. Where the injury is personalized to a shareholder and flows from a violation of rights inherent in the ownership of stock, suit may be brought by the shareholders. On the other hand, where the injury is to the corporation and only affects the shareholders incidentally, the action is derivative. *Vincel,* 521 F.2d at 1118.

■ In cases where the corporation sustains the injury, the fact that the shareholders may have indirectly suffered individual losses in the form of a diminution in the value of their stock does not entitle them to bring the action in their own names. Since the injury is to the corporation, it is the corporation that is entitled to recover damages. Any loss suffered by the shareholders as a result of the reduction in value of their stock can be redressed by an award of damages to the corporation which would restore the lost value. *Id.*

■ In this case, the plaintiffs are claiming far more than a diminution in the value of their stock. They have alleged a variety of acts constituting breaches of fiduciary duties and violations of numerous securities laws. Furthermore, they assert that those acts were willful and malicious and seek punitive as well as compensatory damages.

In addition, the plaintiffs claim that the loss attributed to the Monarch sale was not borne equally by NCC's shareholders. They assert that, by virtue of the Monarch–NCC agreement, the individual defendants actually profited from the sale, thereby casting the entire loss on the plaintiffs and other shareholders who did not share in those profits. Consequently, any damages were sustained by them and not by the corporation or the class of all shareholders. Such disproportionate treatment is generally recognized as sufficient to confer upon the shareholders adversely affected an individual right of action against the shareholders responsible. *Perlman v. Feldmann,* 219 F.2d 173, 178 (2d Cir.), *cert. denied,* 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955); *Chase National Bank v. Sayles,* 30 F.2d 178, 183 (D.R.I.1927); *Traylor v. The Marine Corp.,* 328 F.Supp. 382, 384 (E.D.Wisc.1971) (minority shareholders entitled to maintain direct action against a majority where defendants allegedly sold corporate assets under terms detrimental only to the minority because not all of the shareholders were injured equally). *See also Empire Life Ins.,* 468 F.2d at 335. That right exists even if a derivative action might also lie. *Perlman,* 219 F.2d at 178; *Borak v. J.I. Case Co.,* 317 F.2d 838 (7th Cir.1963), *aff'd,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

The rationale underlying that rule is readily apparent in this case. If damages were recoverable only by NCC, the defendants, as controlling shareholders, would reap much of the benefit from their alleged wrongdoing. Clearly, the rule regarding

derivative suits was not intended to produce such an absurd result. Accordingly, the Court holds that this action may be maintained by NCC's shareholders acting individually.

### 2. *Private Right of Action*

■ The defendants note that while Congress specifically provided for private enforcement of some sections of the ICA (e.g. § 36(b)), it did not do so in enacting § 17(a)(2) or § 36(a). They claim that such omission evidences a congressional intent not to permit private enforcement of those sections. A similar argument is made with respect to § 13(e) of the 1934 SEA.

In *Lessler v. Little,* the First Circuit explicitly rejected that contention, at least with respect to § 17(a)(2). 857 F.2d 866 (1st Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1130, 103 L.Ed.2d 192 (1989). It pointed out that extensive congressional amendments of the ICA in 1970 and 1980 did nothing to negate previously recognized private rights of action and that the amendments' legislative history indicated an intent to permit such actions by those whom the Act was designed to protect. *Lessler,* 857 F.2d at 871–73. The court went on to hold that "[w]e agree with the Second and Third Circuits that it is consistent with congressional intent and with governing law to imply a private cause of action under the Investment Company Act." *Id.* at 873.

The defendants suggest that the *Lessler* holding should be confined to § 17(a)(2). However, neither logic, precedent, nor the language of the opinion suggest any reason why its holding should not apply equally to § 36(a). While *Lessler* focused on § 17(a)(2), the court also had before it claims under §§ 36(b) and 47(b). Although it upheld dismissal of those claims, it did so on other grounds and after unqualifiedly stating, in general terms, that persons whom the ICA was designed to protect may bring private suits to enforce it. *Id.* at 873–74.

The argument that *Lessler* should be broadly read to encompass other sections of the ICA is supported by the holding in *Moses v. Burgin,* 445 F.2d 369 (1st Cir.), *cert. denied,* 404 U.S. 994, 92 S.Ct. 532, 30 L.Ed.2d 547 (1971). In that case, the First Circuit specifically recognized private rights of action under § 36. The defendants make much of the fact that *Moses* construed § 36 as it existed before the 1970 amendment. At that time, the statute prohibited "gross misconduct or gross abuse of trust" and authorized the SEC to take appropriate enforcement action. The 1970 amendment substituted the standard currently set forth in § 36(a) (i.e. "breach of fiduciary duty involving personal misconduct") and added what is now § 36(b), which expressly provides for a private right of action to recover compensation or other payments received from a registered investment company by an investment adviser or its affiliates in violation of their fiduciary duties. *See Cambridge Fund, Inc. v. Abella,* 501 F.Supp. 598, 621 (S.D.N.Y.1980). The defendants contend that, by expressly conferring a private right of action only under § 36(b), Congress intended to exclude any such right under § 36(a). That argument ignores the purpose of the ICA which has been characterized as a far reaching effort to correct abuses of self dealing that may arise from the potential conflicts of interest inherent in the relationships between mutual funds and their investment advisers. *Lessler,* 857 F.2d at 870–71; *Moses,* 445 F.2d at 376. It also overlooks the fact that private enforcement actions under the predecessor statute to § 36(a) had been judicially recognized before the amendment was enacted. *See, e.g., Moses,* 445 F.2d at 373; *Esplin v. Hirschi,* 402 F.2d 94, 103 (10th Cir.1968), *cert. denied,* 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969); *Brown v. Eastern States Corp.,* 181 F.2d 26 (4th Cir.), *cert. denied,* 340 U.S. 864, 71 S.Ct. 88, 95 L.Ed. 631 (1950). Given the broad remedial purpose of the statute and given the judicial recognition previously extended to private rights of action, it seems likely that if Congress had intended to eliminate such actions, it would have said so.

Indeed, the facts suggest a contrary intent. Congress has specifically expressed a desire that the courts continue to imply

private rights of action by those for whose benefit the statute was enacted. *See Lessler*, 857 F.2d at 873 (citing legislative history). Thus, the legislative history of the 1980 amendments states:

The Congress has long taken the view that private rights of action for violations of the federal securities laws are a necessary adjunct to the Commission's enforcement efforts. With a relatively small staff charged with administrative responsibility for policing potentially unlawful securities-related activities, the Commission cannot be expected to bring actions against even a large portion of those engaged in schemes, devices and activities that are prohibited by federal law. Therefore, private lawsuits serve as an added deterrent to conduct made unlawful by Congress, without the necessity of governmental involvement.

At the same time, and just as important, such lawsuits perform a compensatory function. Violations of these investor protection laws do not simply compromise the integrity of the securities marketplace that Congress has found to be so essential to preserving investor confidence in the capital raising efforts of American enterprise. Frauds, manipulations, misrepresentations, self-dealing and other illegal activity cause real and often severe financial injury to investors, both individual and institutional. Private lawsuits, permitting recovery of damages when properly shown, compensate these victims for the losses they suffer.

. . . .

The Committee wishes to make plain that it expects the courts to imply private rights of action under this legislation, where the plaintiff falls within the class of persons protected by the statutory provision in question. Such a right would be consistent with and further Congress' intent in enacting that provision, and where such actions would not improperly occupy an area traditionally the concern of state law. In appropriate instances, for example, breaches of fiduciary duty involving personal misconduct should be remedied under Section 36(a) of the Investment Company Act. With respect to business development companies, the Committee contemplates suits by shareholders as well as by the Commission, since these are the persons the provision is designed to protect, and such private rights of action will assist in carrying out the remedial purposes of Section 36.

H.R.Rep. No. 1341, 96th Cong., 2d Sess. 28–29, *reprinted in* 1980 U.S.Code Cong. & Admin.News 4800, 4810–11 (footnotes omitted).

The defendants correctly point out that many of the post 1970 cases recognizing private rights of action arose under § 36(b). *Tannenbaum v. Zeller*, 552 F.2d 402, 406 (2d Cir.), *cert. denied*, 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977); *Fogel v. Chestnutt*, 533 F.2d 731, 745 (2d Cir.1975), *cert. denied*, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976); *see Cambridge Fund*, 501 F.Supp. at 619 (analysis of these cases). However, that does not mean that § 36(b) is the sole vehicle for bringing a private action. In *Tannenbaum*, it was held that by adding subsection (b), "Congress did not intend ... to abrogate the private action already recognized under the Act for other types of breach of fiduciary duty." 552 F.2d at 417. Thus, private actions under § 36(a) have been recognized in circumstances involving a variety of breaches of fiduciary duty. *See, e.g., Whitman v. Fuqua*, 549 F.Supp. 315 (W.D.Pa.1982) (clandestine action by directors to undermine the stockholders' veto); *Cambridge Fund*, 501 F.Supp. at 622 (indemnification obtained by adviser and affiliated director for legal expenses they incurred in defending an SEC action); *Bloom v. Bradford*, 480 F.Supp. 139, 145–46 (1979) (must involve some element of self-dealing or personal advantage). *See also Galfand v. Chestnutt*, 363 F.Supp. 291, 295 (E.D.Pa.1973) (transactions between investment adviser and investment company when both have the same chief executive only upheld if "fair" and full disclosure is made).

In short, the defendant's contention that no private right of action exists under § 36(a) is based on an artificially restrictive reading of both the statute and *Lessler*.

Furthermore, it is contrary to the weight of authority.

■ The defendants' argument with respect to § 13(e) of the 1934 SEA suffers from many of the same infirmities. Moreover, the Sixth Circuit has specifically held that private suits may be brought under that section. *Howing Co. v. Nationwide Corp.*, 826 F.2d 1470 (6th Cir.1987), *cert. denied*, 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988). In so doing, it applied the four requirements for implying private rights of action that were articulated in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975). Those requirements are: (1) that plaintiff must be a member of the class for whose benefit the statute was created; (2) that there must be an indication of legislative intent to allow such actions; (3) that implying such a right must be consistent with the legislative scheme; and (4) that the claim is not one that is traditionally relegated to state law. This Court adopts the analysis and conclusions set forth in *Howing* as equally applicable to the instant case.

Having disposed of these threshold procedural issues, the Court will now address the arguments made with respect to the various categories of claims asserted.

## B. *The State Law Claims*

■ Counts One and Three both assert that the defendants' alleged actions constitute fraud and breaches of fiduciary duty under state law. In seeking dismissal, the defendants contend that appraisal is the plaintiffs' exclusive state law remedy. In addition, they argue that, since these are pendent claims, they should be dismissed if the accompanying federal claims are. Those contentions will be considered in turn.

Under Rhode Island law, a shareholder who dissents from a sale of all of the corporation's assets has a statutory right to demand that his shares be appraised and that their value be paid to him. R.I.Gen. Laws §§ 7–1.1–73 and 74. The Rhode Island Supreme Court has expressly reserved judgment as to whether, in such circumstances, appraisal is the exclusive remedy

available under state law. *Bove v. Community Hotel Corp.*, 105 R.I. 36, 53, 249 A.2d 89, 98–99 (1969). Therefore, this Court looks to the law in other jurisdictions for assistance in answering that question.

Since the Rhode Island statute is patterned after Delaware's appraisal statute, the law of that state is particularly persuasive. The Delaware courts have held that appraisal is a dissenting shareholder's exclusive state law remedy unless there are indications of fraud, misrepresentation, self-dealing, deliberate waste of corporate assets or gross or palpable overreaching. When those elements are present, appraisal is considered too limited to deal with the broader issues presented or to provide an adequate remedy. *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del.1983). *See also Rabkin v. Philip A. Hunt Chemical Corp.*, 498 A.2d 1099, 1104 (Del.1985) (unfair dealing claims, such as breach of duty of loyalty, raise issues which appraisal cannot address); *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1187 (Del.1988). This also appears to be the rule in a majority of the other states. *See, e.g., Mullen v. Academy Life Ins. Co.*, 705 F.2d 971, 974 (8th Cir.) (construing New Jersey law as allowing equitable action by minority shareholders upon allegations of breach of fiduciary duty, unlawfulness or fraud by majority), *cert. denied*, 464 U.S. 827, 104 S.Ct. 101, 78 L.Ed.2d 105 (1983); *Yeager v. Paul Semonin Co.*, 691 S.W.2d 227, 228 (Ky.Ct.App.1985); *Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 473 N.E.2d 19, 483 N.Y.S.2d 667 (1984). *But see Yanow v. Teal Industries, Inc.*, 178 Conn. 262, 422 A.2d 311 (1979) (appraisal right held to be exclusive remedy).

In determining whether the appraisal remedy is exclusive, the focus is on the nature of the claims asserted. If the shareholder seeks nothing more than the value of his shares, then appraisal is the exclusive remedy. *Rabkin*, 498 A.2d at 1105. On the other hand, when there are allegations of fraud, unfair dealing or breaches of fiduciary obligations, the plaintiff should not be deprived of other remedies such as rescission and injunctive relief

that might be necessary to restore him to the position he otherwise would have occupied. *Cede,* 542 A.2d at 1187. That approach has much to commend it. In addition to providing a broader panoply of remedies to make the shareholder whole, it also deters fraud and self-dealing. If the liability of corporate insiders who engage in that type of activity is limited to paying a shareholder the value of his stock, such conduct would be encouraged. An unscrupulous insider would have everything to gain and nothing to lose by attempting to defraud shareholders.

In this case, specific allegations of fraud and self-dealing have been made. Moreover, the plaintiffs have demanded punitive damages for the defendants' allegedly fraudulent acts in addition to compensation for the value of their shares. This Court concludes that, in such a case, appraisal is not a shareholder's exclusive state law remedy and that the Rhode Island Supreme Court would so hold if confronted with this question.

The second ground on which defendants urge dismissal of Counts One and Three is that they constitute pendent state law claims and should not be entertained if all of the federal claims are dismissed. The short answer to that argument is that, for reasons hereinafter discussed, the federal claims will not be dismissed. Therefore, since both categories of claims derive from a common nucleus of operative facts, the state law claims will not be dismissed. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### C. *The 1934 SEA Claims*

#### 1. *Sections 14(a) and 10(b)*

Counts Two and Four are based on assertions that the proxy statement misrepresented and omitted material facts and, therefore, violated §§ 14(a) and 10(b) of the 1934 SEA [5] as well as Rules 14a–9 and 10b–5 of the Securities and Exchange Commission.[6] The pertinent requirements of those provisions are most succinctly set out in Rules 14a–9 and 10b–5. Rule 14a–9 states:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false and misleading.

Rule 10b–5 is somewhat broader. It provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

 It is clear that some of the alleged misrepresentations and omissions are insufficient to support a claim under those sections. Included in that category are the variety of assertions to the effect that the defendants failed to adequately disclose the reasons for their conclusions and failed to characterize the proposed transaction as part of a scheme to defraud. In *Lessler,* similar allegations regarding the very same proxy statement were found wanting.

---

**5.** 15 U.S.C. §§ 78n(a) and 78j(b).

**6.** 17 C.F.R. §§ 240.14a–9 and 10b–5.

There, the Court noted that the purpose of both §§ 10(b) and 14(a) is not to judge the merits of a proposed transaction but rather to require disclosure of "such relevant and material *facts* as would enable a reasonably prudent stockholder to make an intelligent decision." *Lessler,* 857 F.2d at 875 (emphasis added) (quoting *Golub v. PPD Corp.,* 576 F.2d 759, 764 (8th Cir.1978)). It cited, with approval, holdings by other circuits that where a proxy statement discloses sufficient facts to make a director's potential conflict of interest obvious to any reasonable shareholder, it need not label or editorialize on those facts. *Lessler,* 857 F.2d at 875. Applying that standard to the proxy statement at issue in the instant case, the *Lessler* court held that complaints about its failure to characterize the arrangement between Monarch and NMC as a sham to divert NCC's assets were complaints "about the wording and editorial presentation of the proxy statement, not its substance" and, therefore, failed to state a claim under §§ 10(b) or 14(a).

■ On the other hand, it is equally clear that some of the misrepresentations and omissions alleged in Counts Two and Four do relate to factual matters and involve complaints about more than the form of the proxy statement. In this category are assertions that the proxy statement failed to disclose pertinent information regarding the value of NCC's investments, that the defendants had limited the information on which Salomon's opinion was based and that the proxy statement grossly understated the value of stock owned by one of NCC's subsidiaries in another corporation. The defendants advance a potpourri of reasons why they say these claims are not cognizable under §§ 10(b) and 14(a).

a. Duty to Disclose

The defendants contend that asset valuations constitute "soft" information that need not be disclosed in a proxy statement. The authorities appear to be divided on this question. Some courts do not require disclosure of asset valuations or financial projections under any circumstances on the theory that such information is not suffi-

ciently reliable. *See, e.g., Panter v. Marshall Field & Co.,* 646 F.2d 271, 292 (7th Cir.) (no duty to disclose financial projections), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *Gerstle v. Gamble–Skogmo, Inc.,* 478 F.2d 1281, 1294 (2d Cir.1973) (no duty to disclose asset appraisals; no Second Circuit rule on financial projections). Other courts require disclosure only if the calculations can be made with reasonable certainty. *Starkman v. Marathon Oil Co.,* 772 F.2d 231, 241–42 (6th Cir.1985) (no duty to disclose financial projections unless they are "substantially certain"), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986); *Vaughn v. Teledyne, Inc.,* 628 F.2d 1214, 1221 (9th Cir.1980) (no duty to disclose if there is no evidence estimates were not made with "reasonable certainty").

The SEC, itself, has exhibited some ambivalence with respect to this issue. For some time, it followed a definitive policy against the disclosure of "soft" information based on concerns that investors might give it unwarranted credence and that the Commission would be unable to determine the reliability of such information on a case by case basis. *See Flynn v. Bass Brothers Enterprises, Inc.,* 744 F.2d 978, 985 (3d Cir.1984). However, recent indications are that, at least in the context of liquidations, the SEC has become more receptive to disclosure of good faith appraisals having a reasonable basis. *See Flynn,* 744 F.2d at 987.

■ After a comprehensive analysis of the subject, the Third Circuit adopted a rule setting forth what this Court finds to be an eminently reasonable method of resolving the competing concerns involved. Henceforth, the law is not that asset appraisals are, as a matter of law, immaterial. Rather, in appropriate cases, such information must be disclosed. Courts should ascertain the duty to disclose asset valuations and other soft information on a case by case basis, by weighing the potential aid such information will give a shareholder against the potential harm, such as undue reliance, if

the information is released with a proper cautionary note.

*Flynn,* 744 F.2d at 988 (footnote omitted). That determination requires consideration of factual issues that cannot properly be resolved in the context of a motion to dismiss. *See id.* at 988. Therefore, this Court cannot say, as a matter of law, that there was no duty to disclose the information in question.

■ Even if there is no independent duty to disclose relevant "soft" information, such a duty would have been created if partial or erroneous disclosures were made with respect to material matters. When a corporation provides information to shareholders that is likely to affect their decision, the corporation has a duty to make that information complete and accurate. *Roeder v. Alpha Industries,* 814 F.2d 22, 26 (1st Cir.1987); *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 860–61 (2d Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Here, the complaint asserts, in effect, that the defendants presented information regarding the value of NCC's holdings but omitted additional information that would have demonstrated the value of those holdings to have been much greater. Furthermore, it alleges that the defendants failed to divulge that they had limited the scope of the information utilized in Salomon's inquiry regarding the value of NCC's assets. If proven, the omission of such facts would render the presentation to shareholders incomplete and misleading and would give rise to a duty to disclose the additional "soft" information.

This rule of completeness applies equally to situations in which misstatements have been made. While the line between half truths and untruths is sometimes difficult to draw, both trigger a duty to disclose any additional or contradictory facts that may be necessary to present shareholders with a complete picture and prevent them from being misled. *Roeder,* 814 F.2d at 26. In this case, the complaint charges that the proxy statement grossly understated the total value of NCC's investments by presenting information that distorted the value of stock owned by one of its subsidiaries in another corporation. If proven, that would require disclosure of any additional information that might lead shareholders to a different conclusion.

■ Finally, the defendants overlook the fact that, to the extent they traded in NCC's stock or received an economic benefit from the Monarch transaction, they were under an obligation to disclose material information or abstain from trading. *See Dirks v. S.E.C.,* 463 U.S. 646, 653, 103 S.Ct. 3255, 3260, 77 L.Ed.2d 911 (1982); G. Hazen, *The Law of Securities Regulation,* § 13.9 at 488 (1985). As previously stated, the complaint does allege that such benefits were received and that information was withheld. Moreover, as will be discussed, *infra,* it also alleges sufficient facts from which one could conclude, at least within the context of a motion to dismiss, that such information was material. *See Froid v. Berner,* 649 F.Supp. 1418 (D.N.J.1986) (fact specific materiality determination of undisclosed "soft information" not appropriate on motion to dismiss).

b. Materiality

■ In order to be actionable under the 1934 SEA, an omission or misstatement must be material. *T.S.C. Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Information is deemed material if a reasonable investor might have considered it important in making the investment decision at issue. *Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472–73, 31 L.Ed.2d 741 (1972); *Roeder,* 814 F.2d at 25.

■ In this case, the defendants offer very little to support their contention that the omissions and misstatements complained of fail, on their face, to satisfy that requirement. On the contrary, allegations regarding misrepresentations as to the value of NCC's assets and nondisclosure of limitations on the information underlying Salomon's fairness opinion implicate matters at the heart of the decision confronting shareholders.

In any event, a determination with respect to materiality frequently "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *T.S.C. Indus.*, 426 U.S. at 450, 96 S.Ct. at 2133 (footnote omitted). Consequently, such issues are not susceptible to resolution by way of a motion to dismiss. In short, when the instant complaint is construed in the light most favorable to the plaintiffs, it cannot be said beyond doubt that they will be unable to prove that the information allegedly misstated or omitted would have been important to a reasonable shareholder in making a decision.

### c. Reliance

Another element that must be proven to establish a violation of §§ 10(b) or 14(a) is that the aggrieved shareholder actually relied on the alleged misstatements or omissions. In other words, before liability can be imposed on those responsible for the proxy statement, a nexus must be established between the alleged misinformation and the action taken by the complainant. *E.g.*, *Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 92 (2d Cir.1981) (reliance necessary to restrict Rule 10b–5 to situations in which there is a causal connection between the defendants' act and the plaintiff's injury); *Lewis v. McGraw*, 619 F.2d 192, 195 (2d Cir.) (cause of action under § 14 requires a misrepresentation upon which the shareholders relied), *cert. denied*, 449 U.S. 951, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980).

In this case, defendants argue that there was no reliance because, by voting against the Monarch transaction, the plaintiffs demonstrated that they were not fooled by the alleged misstatements and omissions and, therefore, their actions could not have been influenced by them. The logic of that argument would be unassailable in situations where a shareholder is in a position to control his own destiny by acting or not acting in accordance with the alleged misrepresentations or omissions.

In this case, however, the plaintiffs were members of a group consisting of all NCC shareholders and were bound by the collective decision of a majority of those shareholders. Their inability to influence the group's decision is evidenced by the fact that the Monarch transaction was approved despite their opposition. Consequently, the relevant inquiry is not whether *these* plaintiffs were misled into acting as they did but whether the class of *all shareholders* was deceived into voting in favor of the sale and liquidation. *See J.I. Case v. Borak*, 377 U.S. 426, 432, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964).

When a material misrepresentation or omission is established, reliance is presumed because courts recognize the unreasonable evidentiary burden that would be placed on an investor if he was required to prove a "speculative state of facts, i.e., how he would have acted if omitted material information had been disclosed ... or if the misrepresentation had not been made." *Basic, Inc. v. Levinson*, 485 U.S. 224, 245, 108 S.Ct. 978, 990, 99 L.Ed.2d 194 (1988) (citations omitted). Of course, that presumption may be rebutted by evidence that the alleged misinformation had no effect on the action taken. *Id.* at 248, 108 S.Ct. at 992. However, that is an issue that cannot be resolved by way of a motion to dismiss. In this context, the complaint is sufficient if it recites facts from which one could conclude that the shareholders reasonably may have relied upon the alleged misrepresentations and omissions. The instant complaint passes that test.

### d. The Purchaser–Seller Requirement

Rule 10b–5 applies only to the "purchase or sale" of securities. Thus, in order to bring suit under that section, one must be a purchaser or seller. *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). That requirement is construed strictly. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

In this case, the defendants argue that the plaintiffs cannot be considered

sellers of their stock because they voted against the sale to Monarch and opted to retain their shares and demand their appraised value. That argument overlooks the fact that shareholder approval of the Monarch sale terminated the plaintiffs' interest in NCC and left them with no alternative but to convert their shares to cash. While the First Circuit has not yet considered the question, many courts have concluded that this is tantamount to a forced sale and, therefore, is cognizable under Rule 10b–5. *See, e.g., Jeanes v. Hendersen,* 703 F.2d 855, 860 (5th Cir.1983) (doctrine has continuing validity after *Blue Chip Stamps* ); *Marsh v. Armada Corp.,* 533 F.2d 978, 981–82 (6th Cir.1976), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977); *Vine v. Beneficial Finance Co.,* 374 F.2d 627, 632–636 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967); *Umstead v. Durham Hosiery Mills, Inc.,* 578 F.Supp. 342 (D.N.C.1984). *See also* G. Hazen, *The Law of Securities Regulation* 453 (1985).

This Court sees no reason for deviating from what appears to be the weight of authority. Consequently, in the instant case, I find that the "sale" requirement of Rule 10b–5 has been satisfied.

### 2. *Section 13(e)*

Section 13(e) of the 1934 SEA prohibits a registered investment company from purchasing its own stock unless it complies with the disclosure requirements of applicable SEC regulations. 15 U.S.C. § 78m(e) and 17 C.F.R. § 240.13e. In this case, the plaintiffs contend that NCC violated that prohibition by failing to file information regarding the fairness of the transaction as set forth in Rule 13e–3(e)(1) and Item 8 of Schedule 13E–3. The defendants contend that such disclosures were not required because NCC did not "purchase" its stock.

A "purchase" within the meaning of § 13(e) is defined in Rule 13e–3(a)(2) as follows:

(2) The term "purchase" means any acquisition for value including but not limited to, (i) any acquisition pursuant to the dissolution of an issuer subsequent to

the sale or other disposition of substantially all the assets of such issuer to its affiliate ... and (iv) any acquisition subject to the control of an issuer or an affiliate of such issuer.

 It is clear that NMC's alleged acquisition of an interest in NCC's assets does not constitute a "purchase." The complaint describes that interest as being 20% of the net profit realized by Monarch on any resale plus an annual commission equal to 2–3% of the value of the assets retained. That amount falls far short of what might be characterized as "substantially all" of NCC's assets. However, Monarch's acquisition of all of NCC's assets would constitute a "purchase" if Monarch was an "affiliate" of NCC or if the acquisition was subject to the control of such an affiliate. Rule 13e–3(a)(1) defines an "affiliate" as follows:

'an affiliate' of an issuer is a person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with such issuer.

In enacting the SEA, Congress did not attempt to formulate a precise definition of "control" because it recognized that "[i]t would be difficult if not impossible to enumerate or to anticipate the many ways in which control may be exerted." H.R.Rep. No. 1383, 73d Cong., 2d Sess. 26 (1934). The regulations promulgated by the SEC provide some guidance. They define control as:

[t]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise.

17 C.F.R. § 240.12b–2 (1983). A determination as to whether control exists depends upon the particular factual circumstances of each case. *See Metge v. Baehler,* 762 F.2d 621 (8th Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986).

 The plaintiffs have made no allegation that Monarch exercised any direct control over NCC or that the two corporations were under common control. The com-

plaint merely describes Monarch as an insurance holding company and fails to even name it as a defendant. However, the complaint is replete with allegations that the individual defendants did control both NCC and NMC and that they conspired with Monarch in a plan to purchase NCC's assets at a grossly inadequate price and to share in the profits. If proven, those allegations would be sufficient to cast the defendants as affiliates of NCC who controlled the corporation's acquisition of its shares. Rule 13e–3(a)(2)(iv).[7] Consequently, the acquisition would be deemed a "purchase" within the meaning of § 13(e). Moreover, proof of those allegations would warrant characterizing the acquisition as a Rule 13e–3 transaction which is defined as follows:

> (3) A "Rule 13e–3 transaction" is any transaction or series of transactions involving ... [a] purchase of any equity security by the issuer of such security or by an affiliate of such issuer.

In either event, the disclosure requirements of Rule 13e–3(e)(1) and Item 8 of Schedule 13E–3 would be triggered. Whether the defendants exercised the requisite degree of control presents a factual question that cannot be resolved by means of a Rule 12(b)(6) motion.

### 3. *Individual Liability—Section 20*

Since the individual defendants did not issue the proxy statement or purchase the plaintiffs' stock, the complaint predicates their 1934 SEA liability at least in part on §§ 20(a) and (b).[8] In essence, those sections make it unlawful to participate in prohibited activity indirectly or through another person and they impose joint and several liability on those controlling an entity that engages in unlawful conduct. The defendants suggest that those sections are inapplicable to them because they did not exercise the requisite degree of control over NCC.

■■■■■ A similar argument was discussed in the context of § 13(e). The analysis under § 20(a) is not much different. There is no question that a corporation's directors, officers and shareholders may be deemed "controlling persons" within the meaning of § 20(a) if they dominated the activities of the corporation. *Holmes v. Bateson,* 434 F.Supp. 1365, 1384 (D.R.I. 1977), *aff'd in part and rev'd in part,* 583 F.2d 542 (1st Cir.1978) (officers and directors); *Klapmeier v. Telecheck International, Inc.,* 315 F.Supp. 1360, 1361 (D.Minn.1970) (majority shareholder). Moreover, at least in the case of directors, liability may be imposed even if they did not actively participate in the illegal activity itself. In fact, directors are prima facie considered "controlling persons." *American General Ins. Co. v. Equitable General Corp.,* 493 F.Supp. 721, 752 (E.D.Va.1980). In this case, whether the individual defendants exercised sufficient control over NCC to warrant denominating them as controlling persons is a factual question that cannot be properly resolved by a motion to dismiss.

### D. *The Investment Company Act Claims*

Counts Five and Six are predicated on alleged violations of §§ 17(a)(2) and 36(a) of the Investment Company Act of 1940. The defendants contend that the sections in question are not applicable to the instant case for a number of reasons.

### 1. *Sections 17(a)(2) and 48(a)*

Section 17(a)(2) of the ICA [9] prohibits any person affiliated with a registered investment company from purchasing any securities or other property from it. Section 48(a) [10] makes it clear that the prohibition also extends to purchases that are accomplished indirectly or through other persons.

■■■■ The defendants do not dispute that an investment company's officers, directors

---

**7.** Whether they would also establish that the defendants were intermediaries through whom Monarch exercised control over NCC's purchase of its shares is a question that need not be addressed.

**8.** 15 U.S.C. § 78t(a) and (b).

**9.** 15 U.S.C. § 80a–17(a)(2).

**10.** 15 U.S.C. § 80a–47(a).

and investment advisers are all affiliated persons within the meaning of § 17(a)(2). However, they do dispute the applicability of that section to them, saying that they did not purchase any assets of NCC. They argue that NCC's assets were purchased by Monarch and that such purchase was separate from and preceded the Monarch–NMC fee agreement that is alleged to have given NMC an interest in NCC's assets. *Lessler* is dispositive of that argument, at least insofar as the NMC owners are concerned. Here, as in *Lessler*, the thrust of the complaint is that, while the two transactions were separate on their face, they were related parts of a single deal. Consequently, the First Circuit's holding in *Lessler* is equally applicable in this case.

> Especially in light of section 48(a), which makes it unlawful to do indirectly that which one could not do directly, we believe that if [plaintiff] can prove that the two transactions are related in the way he alleges, he will have a valid claim under section 17(a)(2). To hold otherwise would elevate form over substance and ignore the broad remedial purposes of the Act; it would allow the defendants, simply by structuring a deal in two parts, to immunize their plan from judicial scrutiny under the Investment Company Act. [Citations omitted]. Since it is prohibited by the Act for Management Company directly to purchase Narragansett assets, we fail to see why the Act could not also reach Management Company's attempt to achieve the same result through the more circuitous route of selling Narragansett to a third party while itself retaining an interest (in the form of an excessive contingent advisory fee) in Narragansett assets.

*Lessler*, 857 F.2d at 873.

### 2. *Section 36(a)*

 Section 36(a)[11] makes it unlawful for a registered investment company's officers, directors or investment advisers to engage in any activities "constituting a breach of fiduciary duty involving personal misconduct." The parties agree that the parameters of § 36(a) are not necessarily congruent with those delineating common law breaches of fiduciary duty. However, they disagree as to the type of conduct encompassed by § 36(a). The defendants assert that the fiduciary duty described in that section extends only to claims alleging failure to recapture excess brokerage fees. As discussed in Part III. A. of this opinion, that assertion is contrary to the weight of authority. Cases recognizing private rights of action under § 36(a) as well as those dealing with administrative enforcement actions demonstrate that the fiduciary duty referred to by § 36(a) extends well beyond the recapture of brokerage fees. *Moses*, 445 F.2d at 376–77. It includes a "duty of full disclosure to … unaffiliated directors in every area where there [is] even a possible conflict of interest." *Id.* at 376. In this case, the plaintiffs have clearly alleged facts that would constitute a breach of that duty.

 The defendants also contend that § 36 is inapplicable to them because they were not serving as NCC's officers, directors, or investment adviser at the time this suit was brought. They point to the language of § 36(a) which imposes liability if:

> a person serving or acting [as an officer, director, or investment adviser] has engaged within five years of the commencement of the action or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person so serves or acts….

15 U.S.C. § 80a–35(a). The defendants ask the Court (perhaps "tongue in cheek") to read those words to mean that the statute applies only to one who is both "serving or acting" in one of the enumerated capacities at the time of *suit* and who engaged in the proscribed conduct within five years before that.

While the language of the statute leaves something to be desired, the interpretation urged by the defendants would distort its obvious meaning and produce a ludicrous

---

**11.** 15 U.S.C. § 80a–35(a).

result. A reasonable reading of this section leads one to the conclusion that the words "serving or acting" refer to the time at which the alleged abuse of trust *occurred*, not to the time of *suit*. Otherwise, the statute would be a virtual nullity inasmuch as wrongdoers could avoid liability by the simple expedient of resigning after committing their misdeeds but before any formal action could be taken against them. Clearly, that is not what Congress intended. Indeed, an argument similar to that advanced by the defendants has been rejected by at least one court. *See SEC v. Wong*, 252 F.Supp. 608 (D.P.R.), *motion denied*, 254 F.Supp. 66 (D.P.R.1966). This Court also rejects it.

### E. *The Negligence Claim Against Salomon Brothers*

Count Eight of the complaint asserts a claim against Salomon Brothers for negligence and/or negligent misrepresentation. Salomon seeks dismissal of that count on the grounds that the requisite elements of duty and reliance are lacking.

#### 1. *Negligent Misrepresentation—Reliance*

In order to support a claim for negligent misrepresentation, the plaintiffs must establish that they justifiably relied on the alleged misrepresentation. Salomon contends that there was no such reliance in this case. It points out that the plaintiffs voted against the sale to Monarch and, therefore, could not have been misled by its opinion that the purchase price was fair.

That contention embodies the same flaw contained in the reliance argument asserted by the remaining defendants in connection with the claims under §§ 14(a) and 10(b) of the 1934 SEA. *See supra*, Part III. C. Simply stated, when a misrepresentation is made to a limited group of persons, an individual member of the group may be said to have relied on it if the misrepresentation induced the group to take action that was binding upon him even though he previously dissented. *See* Restatement (Second) of Torts § 552(2)(a) (1977). *See also* W. Keeton, D. Dobbs, R. Keeton, and D. Owen, *Prosser and Keeton on the Law of Torts* § 107 at 747, Supp. at 105 (5th ed. 1984 & Supp.1988) (hereinafter Prosser and Keeton). To hold otherwise would deny redress to a group member harmed by a misrepresentation even though the member was unable to avoid the harm. It would also create the further anomaly of allowing recovery to those other members of the group whose majority action was the vehicle for that harm merely because they were actually deceived. Such a distinction is untenable. In each case, the harm is identical and flows just as directly from the misrepresentation. Therefore, the party making the misrepresentation should be equally accountable in both cases.

In this case, the allegation is that the plaintiffs were forced to liquidate their stock because Salomon's negligent misrepresentation induced a majority of the other shareholders to approve the Monarch sale. In this context, that is sufficient to satisfy the reliance element.

Salomon also contends that one may not justifiably rely on an expression of opinion as opposed to an assertion of fact. While that argument may be valid in other situations, it is not when the opinion is expressed by an expert under circumstances implying that the speaker has unique access to facts which support the opinion. Prosser and Keeton at 760–61. In such cases, the combination of specialized knowledge not possessed by the listener and apparent access to facts not available to the listener may turn what would otherwise be an opinion into an assertion upon which the listener may reasonably rely.

Here, it is apparent that Salomon held itself out as an expert in valuing stock. It is equally apparent that Salomon was perceived as having access to all information relevant to a proper appraisal. Whether the circumstances imparted an assertive quality to its opinion sufficient to make reliance upon it justifiable is a question of fact that cannot be resolved via a motion to dismiss.

## 2. *Negligence—Duty*

Salomon contends that it cannot be liable to these plaintiffs for negligence because it owed them no duty of care inasmuch as it was engaged by NCC. It is true that courts have reached different results regarding the liability of accountants to third parties with whom they were not in privity for negligence in preparing or analyzing corporate financial statements. *Compare Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931) (no liability) *with Rusch Factors Inc. v. Levin,* 284 F.Supp. 85 (D.R.I.1968) (liability). However, upon closer examination, the conflict seems to be more apparent than real. Those cases finding no liability generally involve situations in which the scope of potential liability cannot be calculated because it is impossible to accurately predict who might suffer foreseeable harm or what the magnitude of that harm might be. In such circumstances, courts have been understandably reluctant to impose on accountants an open ended liability to third parties for the consequences of the accountant's carelessness in rendering normal services to a client. Such exposure has been described as "liability in an indeterminate amount for an indeterminate time to an indeterminate class." *E.g., Ultramares,* 174 N.E. at 444. On the other hand, those cases in which liability is imposed generally deal with situations in which the plaintiff belongs to a limited class of persons (e.g. creditors or investors) whose reliance was actually foreseen. *See, e.g., Rusch Factors, supra.* In such circumstances the courts essentially adopt the rule set forth in the Restatement (Second) of Torts § 552 which states:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

*See, e.g., Hochfelder v. Ernst & Ernst,* 503 F.2d 1100 (7th Cir.1974) (plaintiffs must be members of a limited class whose reliance on the financial statements is specifically foreseen) *rev'd on other grounds,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Koch Indus., Inc. v. Vosko,* 494 F.2d 713 (10th Cir.1974) (must be specifically foreseen); *Ingram Indus., Inc. v. Nowicki,* 527 F.Supp. 683 (E.D.Ky.1981) (adopting Restatement view); *Coleco Indus. Inc. v. Berman,* 423 F.Supp. 275 (E.D.Pa.1976).

The instant case falls squarely within the Restatement rule. Salomon was hired to assess the adequacy of the proposed purchase price for NCC's assets. That assessment was patently intended to guide shareholders in deciding whether to approve the sale. Consequently, Salomon's duty to exercise reasonable care in preparing its assessment extended to NCC's shareholders.

## IV. *Conclusion*

For all of the foregoing reasons, the Defendants' Motions to Dismiss the Second Amended Complaint are denied as to all counts.

IT IS SO ORDERED.